COMMONWEALTH *vs.* DARRELL P. TAVARES
(and twenty-five companion cases[1]).

No. 02-P-1386.

Plymouth. January 8, 2004. - June 25, 2004.

Present: LENK, GELINAS, & TRAINOR, JJ.

*Mayhem. Assault and Battery. Assault and Battery by Means of a Dangerous Weapon. Evidence,* Joint enterprise. *Joint Enterprise. Intentional Conduct. Wanton or Reckless Conduct.*

At the trial of indictments charging mayhem, assault and battery causing bodily injury to a child, assault and battery by means of a dangerous weapon, and assault and battery, all on theories of joint venture, the judge properly denied the defendants' motions for required findings of not guilty, where the evidence at the close of the Commonwealth's case permitted a reasonable jury to conclude that the defendants, having had exclusive physical custody of the child during the time that he was injured, and living in a small motel room in which both defendants were present for at least one incident of abuse, were participants in the offenses, counseled one another, and agreed to stand by or near the scene, or were present during the abuse; likewise, the evidence at the close of the Commonwealth's case permitted a reasonable jury to find that each defendant was present with knowledge of the other's intent to commit the crime, and that they shared that intent. [388-390]

At the trial of indictments charging the defendants with mayhem, based on injuries to the fingernails of a child in the defendants' custody, the nature of the injuries, the manner of infliction, and the repetition necessary to injure multiple fingers rendered the injuries sufficiently serious to fall within the scope of G. L. c. 265, § 14. [390-392]

At the trial of indictments charging the defendants with mayhem, based on injuries to the eyes of a child in the defendants' custody, the evidence of the injury done to the child's eyes was sufficient to support the theory that the defendants had disfigured or disabled the child's eyes, even if at trial the child no longer had difficulty keeping his eyes open, or if the scarring did not permanently impair his vision. [392]

At the trial of indictments alleging assault and battery causing bodily injury to a child, the omission of an instruction to the jury to consider the wanton or reckless theory of assault and battery did not create a substantial risk of a miscarriage of justice, where the jury on other indictments received instruction on the meaning of both intentional and wanton or reckless assault and

---

[1]Twelve against Darrell P. Tavares, and thirteen against Loraine Tavares.

battery, and where the jury were presented with evidence from which a reasonable jury could find such conduct. [393-396]

INDICTMENTS found and returned in the Superior Court Department on July 17, 2000.

The cases were tried before *Margaret R. Hinkle*, J.

*David B. Mark* for Loraine Tavares.

*Alba Doto Baccari* for Darrell P. Tavares.

*Kelly-Anne DeFao*, Assistant District Attorney, for the Commonwealth.

LENK, J. The defendants, Darrell P. Tavares and Loraine Tavares, each appeal from their convictions of four indictments for mayhem (G. L. c. 265, § 14), six indictments for assault and battery causing bodily injury to a child (G. L. c. 265, § 13J[*b*][1]), one indictment for assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A[*b*]), and two indictments for assault and battery (G. L. c. 265, § 13A).

On appeal, the defendants argue that (1) the judge erred when she denied the defendants' motions for required findings of not guilty on every indictment because the Commonwealth failed to prove the required elements of joint venture; (2) indictments 103617 and 103634 for mayhem caused by injury to fingernails by a needle-like object should have been dismissed because the injury was not proved to be serious or permanent; (3) indictments 103616 and 103633 for mayhem caused by a substance in the eyes were wrongly submitted to the jury on a theory of mayhem unsupported by the evidence; and (4) the judge erred when she allowed a conviction to enter on indictments 103620 and 103637 (assault and battery causing bodily injury to a child) after the jury returned guilty verdicts on a theory of guilt not submitted to them.

*Background.* Viewed in the light most favorable to the Commonwealth, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), the jury would have been warranted in finding the following. Theresa Campanale asked her sister and her brother-in-law, Loraine and Darrell Tavares, to take care of her

then four year old son, Jack, and his younger sister Janet.[2] The defendants picked up Jack and Janet in May, 2000, from Campanale's apartment in Lawrence; at that time the children were completely well and had no noticeable injuries. Jack and his sister stayed with the defendants in unit seven of the Pilgrim Motel in Norwell. Unit seven was small; it contained sufficient space for a double bed, and a table and chairs; there was a full bathroom and an alcove for cooking. Jack and Janet stayed with the defendants for several weeks. The manager of the Pilgrim Motel testified she saw the two children at the motel, and also that she heard Darrell Tavares shouting angrily. A neighbor who lived in a unit that adjoined the defendants' unit testified that she heard screaming, crying, and yelling from children after 11:30 P.M.; she heard Darrell Tavares yelling "shut the fuck up or else I'm going to hit you," and afterwards she heard children crying.

Anthony Chavis, brother of Theresa Campanale and the defendant Loraine Tavares, saw Jack on three occasions while Jack was living with the defendants. During his first visit, Chavis observed no injuries on Jack. During his second visit, Chavis observed that Jack's eyes were blue, although his natural eye color was brown. During Chavis's third visit, he observed that Jack had a cut on his head, his lips were swollen, his eyes were still blue, and he had trouble keeping them open. During this last visit, Jack urinated on himself during dinner. According to Chavis, Loraine said to Darrell, "take care of that"; Darrell grabbed Jack by the arm, held him in the air, and hit him with a construction belt on his buttocks two or three times. The next day when Chavis returned from shooting a BB gun with Darrell, he observed that Jack had a fresh cut on his head and his shirt was soaking wet.

The defendants, accompanied by Chavis, returned Jack and Janet to Campanale on June 12, 2000. Campanale testified to the following. Jack looked sick and thin. His cheek was bruised and his lip swollen and split open. His head had deep cuts and his eyes were blue and cloudy. Jack's body was covered in bruises, his elbow and fingers were swollen, and he had an open wound on his penis. Campanale took Jack to the

---

[2] We use pseudonyms for the children's names.

emergency room at Lawrence General Hospital the morning of June 13, 2000. Jack was transferred to Children's Hospital in Boston where he remained for fifteen days in order to receive treatment. On June 14, 2000, at Children's Hospital, Jack was examined by Dr. Alice Newton, the medical director of the child protection team at Massachusetts General Hospital, who subsequently testified at trial.

*Joint venture.* We review the judge's denial of the defendants' motions for required findings of not guilty, considering only the evidence presented in the Commonwealth's case. *Commonwealth* v. *Berry*, 431 Mass. 326, 331 (2000). We assess whether a joint venture theory was warranted by the evidence presented. *Ibid.*

The defendants argue that the Commonwealth did not prove the elements of joint venture under either of the two recognized theories. A joint venturer, under the first theory, "aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). In order to be held liable as a joint venturer on this first theory, it must be shown "that the defendant was '(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit [the] crime, and (3) by agreement is willing and available to help the other if necessary.' " *Commonwealth* v. *Carroll*, 439 Mass. 547, 553 (2003), quoting from *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). A defendant need not be at the scene of a crime throughout its occurrence in order to be found a joint venturer. *Commonwealth* v. *Sim*, 39 Mass. App. Ct. 212, 217 (1995). *Commonwealth* v. *Lafayette*, 40 Mass. App. Ct. 534, 537 (1996). One may be considered "present" for purposes of joint venture even if only "in the vicinity of the crime." *Commonwealth* v. *Kilburn*, 426 Mass. 31, 34 n.5 (1997), quoting from *Commonwealth* v. *Mahoney*, 405 Mass. 326, 329 (1989). *Commonwealth* v. *Echavarria*, 428 Mass. 593, 598 n.3 (1998). *Commonwealth* v. *Rock*, 429 Mass. 609, 617-618 (1999).

A second theory provides that a defendant may be a joint venturer if she or he "somehow participated in committing the

offense, by counseling, hiring or otherwise procuring the principal, [or] by agreeing to stand by, at, or near the scene to render aid, assistance or encouragement." *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. 238, 242 (1982). See *Commonwealth* v. *Ortiz*, 424 Mass. 853, 856 (1997). Under this second theory, a defendant may be liable if he or she participated in the venture and "sought to make it succeed." *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. at 242.

The defendants argue that the Commonwealth was unsuccessful in proving joint venture under either theory because it did not prove presence at the scene of the relevant injuries, see *Commonwealth* v. *Bianco*, 388 Mass. at 366, nor did it prove the defendants counseled, hired, or otherwise procured the crime to be committed. See *Commonwealth* v. *Caramanica*, 49 Mass. App. Ct. 376, 381 (2000). Although the two joint venture theories differ ("[t]he point of difference . . . is the factor of the defendant's presence at the scene of the felony"), the Supreme Judicial Court has noted that "decisions have spoken of the two theories interchangeably." *Commonwealth* v. *Ortiz*, 424 Mass. at 856. In *Commonwealth* v. *Caramanica*, 49 Mass. App. Ct. at 381, we observed:

> "Admittedly, the case law over the years has muddled the issue. Although something of an oversimplification, presence is *not* required where a defendant actually 'aids or abets' in the commission of a crime . . . but presence generally *is* required where a conviction is sought on the basis that a defendant 'shared' the principal's criminal intent (i.e., 'mental state'), and may have merely stood by, but by agreement was ready to assist if necessary" (emphasis in original).

Following *Caramanica*, we wrote in *Commonwealth* v. *Batista*, 53 Mass. App. Ct. 642, 646 (2002), "[u]nder either theory of joint venture, the critical question is whether the defendant acted with knowledge of the [crime] and with the intent to assist in the commission of that crime so as to accomplish its objective." In order to succeed on a joint venture theory, the Commonwealth is not required to prove the identity of the actual perpetrator. *Commonwealth* v. *Netto*, 438 Mass. 686, 700-701 (2003).

In this case, the judge instructed the jury as to both theories of joint venture. Each defendant argues that there was no proof that he or she was present at the scene when injuries were inflicted. The defendants further argue that although the number of Jack's injuries permit an inference that the defendants would eventually have had to become aware of his physical abuse, that inference is insufficient to establish either the "presence" of either defendant or their participation. To support a conviction on the basis of joint venture, "[t]he inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable." *Commonwealth* v. *Stokes*, 440 Mass. 741, 745 (2004), quoting from *Commonwealth* v. *Brooks*, 422 Mass. 574, 577 (1996). At the close of the Commonwealth's case, the evidence was sufficient to permit the jury reasonably to infer the existence of a joint venture under either theory.

Newton testified that all of Jack's injuries occurred within two weeks of the time that she examined him. Darrell and Loraine had custody of the two children for the relevant time period, and no one else cared for the children during that time. Chavis witnessed Loraine tell Darrell to "take care of that" and then observed Darrell grab Jack and hit him with a construction belt on his buttocks in Loraine's presence. Chavis also observed the accumulation of physical injury to Jack during the time that the child was in Darrell's and Loraine's custody. A reasonable jury could have concluded that the defendants, having had exclusive physical custody of Jack during the time that he was injured, and living in a small motel room in which both defendants were present for at least one incident of abuse, were participants in the offenses, counseled one another, and agreed to stand by or near the scene, or were present during the abuse. A reasonable jury could also have found that each defendant was present with knowledge of the other's intent to commit the crime, and that they shared that intent. Accordingly, it was reasonable for the jury to have found that the defendants were joint venturers. The judge did not err in denying the defendants' motions for required findings of not guilty.

*Fingernails.* The defendants argue that the injury to Jack's fingernails was not proved to be serious or permanent within the meaning of the second branch of the mayhem statute, G. L.

c. 265, § 14.[3] Newton testified that at the time of her examina-tion, Jack's fingers were swollen and had tiny bruises underneath his fingernails caused by a sharp object, such as a needle, having been intentionally stuck under his fingernails.[4] Underneath each fingernail was a tiny line of bruising extend-ing from the front of the finger underneath the nail bed. Newton testified that the injury to Jack's fingernails would have been "very painful"; she further testified that based upon her experi-ence treating children it would likely have involved a struggle. Newton did not reexamine Jack's fingernails at the time of trial.

We have held that where a defendant rubbed handfuls of dirt into a victim's eyes and struck the right side of her face, the evidence warranted a finding of serious or permanent physical injury. *Commonwealth* v. *Tucceri*, 9 Mass. App. Ct. 844, 845 (1980). We determined that vicious blows to the head of an unconscious victim were serious or permanent, *Commonwealth* v. *Mercado*, 24 Mass. App. Ct. 391, 395 (1987), and injuries to a victim's face with a knife were also serious or permanent. See *Commonwealth* v. *Hamm*, 19 Mass. App. Ct. 72, 80 (1984); *Commonwealth* v. *Donoghue*, 23 Mass. App. Ct. 103, 111 (1986), cert. denied, 481 U.S. 1022 (1987). Newton testified that the injuries to Jack's fingernails were so painful that "it would be something that a child would do almost anything to get away from." Her opinion was that a struggle would have been required in order to administer the injuries, unless Jack was unconscious when they were inflicted. The nature of the

---

[3]The second branch of the mayhem statute, G. L. c. 265, § 14, provides as follows: "whoever, with intent to maim or disfigure, assaults another person with a dangerous weapon, . . . and by such assault . . . inflicts serious or permanent physical injury upon such person . . . shall be punished . . . ."

[4]Newton testified as follows:

A. "I think the only way you could get an injury like that is some sharp object being stuck underneath the fingernail, something small, something like a needle."

Q. "And what would your opinion be as to whether that would be an accidental injury versus an intentional injury?"

A. "I think it was clearly intentional because it would be very painful and it was on multiple fingers. I can't imagine the circumstance under which that would happen in any other way."

injuries to Jack's fingernails, the manner of infliction, and the repetition necessary to injure multiple fingers, render them sufficiently "serious" to be within the scope of the mayhem statute. See *Commonwealth* v. *Robinson*, 26 Mass. App. Ct. 441, 445 (1988); *Commonwealth* v. *Sparks*, 42 Mass. App. Ct. 915, 916 (1997).

*Eyes.* The indictments for the injuries to Jack's eyes were submitted to the jury on both branches of mayhem. The defendants argue on appeal that the injury to Jack's eyes was not disabling and that therefore the indictments were improperly submitted to the jury on the theory of first branch of mayhem, which requires the Commonwealth to prove the defendants "disfigure[d] . . . or disable[d] a limb or member."[5]

Newton testified that at the time she first examined him, Jack had dime-sized areas of corneal abrasion and ulceration (cut or loss of tissue) in both eyes.[6] The surfaces of his eyes were bright red. His eyes were sensitive to light and Jack kept them closed. Ample evidence was presented through the testimony of Newton and Chavis that shortly after his injury, Jack had difficulty keeping his eyes open. After examining him at the time of trial, Newton testified that Jack's eyes maintained some scarring on each cornea,[7] resulting in a whitish opaque film on his eyes. The evidence of the injury done to Jack's eyes was sufficient to support the first branch theory of mayhem, even if at trial Jack no longer had difficulty keeping his eyes open, or if the scarring did not permanently impair his vision. Subsequent recovery from an injury does not preclude a determination that the injury disabled a member. See *Commonwealth* v. *Hogan*, 7 Mass. App. Ct. 236, 246, *S.C.*, 379 Mass. 190 (1979). We discern no error in the submission of indictments for injuries to Jack's eyes to the jury on the first branch theory of mayhem.

[5]*Member is defined as* "a bodily part or organ." Webster's Third New Intl. Dictionary 1408 (1993).

[6]Newton offered expert opinion to the effect that the cause of the injury to Jack's eyes was a chemical or liquid caustic burning agent. Newton further testified that household soaps, cleaners, or bleaches contain chemicals consistent with substances that could cause corneal abrasions.

[7]In her brief, the defendant Loraine Tavares acknowledges that when Newton reexamined Jack on the day that she (Newton) testified, "She found that he had residual scars from the cuts on his scalp, and scarring of the corneas of both eyes."

*Jury verdict on indictments 103620 and 103637.* Indictments 103620 and 103637, alleging assault and battery causing bodily injury to a child, G. L. c. 265, § 13J, for injury to Jack's elbow, were submitted to the jury on the theory of intentional assault and battery,[8] not on the theory of wanton or reckless assault and battery.[9] Although the judge instructed the jury as to and submitted the indictments to the jury only on the intentional assault and battery theory, the verdict slips contained check boxes for both theories of guilt. When the jury returned their verdicts, they checked only the box for the wanton or reckless theory. Apparently, neither counsel nor the judge checked the verdict slips before they went to the jury and counsel raised no objection at the time the verdicts were returned.[10] The defendants maintain on appeal that what transpired was error creating a

---

[8]The judge charged the jury as follows. "Let me move on to indictments 103620 and 103637. As to those two indictments, ladies and gentlemen, the part of the body that the indictment deals with is the child's elbow . . . . And as to those two indictments, you must consider each defendant separately. And the indictment is charging the form of intentional assault and battery causing bodily injury to [Jack] as I have defined intentional assault and battery. Is that clear? That is the elbow that you are to concentrate on."

[9]General Laws c. 265, § 13J, provides in part:

> "(b) Whoever commits an assault and battery upon a child and by such assault and battery causes bodily injury shall be punished by imprisonment in the state prison for not more than five years . . . . Whoever commits an assault and battery upon a child and by such assault and battery causes substantial bodily injury shall be punished by imprisonment in the state prison for not more than fifteen years . . . . Whoever, having care and custody of a child, wantonly or recklessly permits bodily injury to such child or wantonly or recklessly permits another to commit assault and battery upon such child, which assault and battery causes bodily injury, shall be punished by imprisonment for not more than two and one-half years . . . . Whoever, having care and custody of a child, wantonly or recklessly permits substantial bodily injury to such child or wantonly or recklessly permits another to commit an assault and battery upon such child, which assault and battery causes substantial bodily injury, shall be punished by imprisonment in the state prison for not more than five years . . . ."

[10]Because counsel did not object at trial, our review of the inconsistency between the judge's instructions and the verdict slips is limited to whether there was a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967). If counsel had objected, the verdict slips could have been amended by the judge.

substantial risk of a miscarriage of justice. See *Commonwealth* v. *Russell*, 439 Mass. 340, 351 (2003).

Although the Commonwealth admits that the jury was not instructed to consider the wanton or reckless theory for indictments 103620 and 103637, and appears to acknowledge that error occurred, it argues that there was no substantial risk of miscarriage of justice because the evidence supported a verdict on either theory of assault and battery causing bodily injury to a child.[11] Moreover, the Commonwealth posits that the error lay not in the verdict slips but in the judge's failure to include in her charge to the jury an instruction on the wanton or reckless theory. We note in this regard, however, that the wanton or reckless portion of G. L. c. 265, § 13J, is not a lesser included offense, see *Commonwealth* v. *Jones*, 59 Mass. App. Ct. 157, 162 (2003), *S.C.*, 441 Mass. 73 (2004), and that the Commonwealth hence was not automatically entitled to an instruction on that crime. See *Commonwealth* v. *Woodward*, 427 Mass. 659, 663-665 (1998).

Proceeding on the assumption that error occurred, we limit our review to determining if there is a serious doubt as to whether the jury verdict might have been otherwise had the unfortunate incongruity between the judge's instructions and the verdict slips not occurred. See *Commonwealth* v. *Russell*, 439 Mass. at 345. We must consider whether, "in the context of the entire trial" and the case as a whole, see *ibid.*, quoting from *Commonwealth* v. *Randolph*, 438 Mass. 290, 298 (2002), there was evidence sufficient to support an instruction on intentional assault and battery and on wanton or reckless assault or battery.

Indictments 103620 and 103637 charged the defendants with assault and battery resulting in the suprachondral fracture to Jack's left elbow, which was surgically repaired with a pin and placed in a cast. Newton testified that this injury could have been caused by a severe direct blow, a bending back of the elbow, or a fall down a flight of stairs. She further testified that

---

[11]The Commonwealth further argues that the judge had intended to include an instruction on wanton or reckless assault and battery but neglected to do so. The transcript reference upon which the Commonwealth relies does not in fact support the Commonwealth's position. At best, the judge's stated views on whether to instruct upon both or just one theory are ambiguous and reflect considerable reluctance to instruct on both theories.

this type of fracture would cause any movement to be restricted by pain. Newton's opinion was that the injury to Jack's elbow was less than a week old when she examined him on June 14, 2000. During the incident that Chavis observed at the dinner table the evening of June 11, 2000, Darrell grabbed Jack's left arm and held him up while he struck him two or three times with his belt. Because the jury returned verdicts of guilty on indictments 103620 and 103637, they surely must have concluded that Jack was in the custody of the defendants when the injury to his elbow occurred. See G. L. c. 265, § 13J ("Whoever, having care and custody of a child, wantonly or recklessly permits substantial bodily injury to such child . . ."). The defendants' custody of Jack during the elbow injury, and Chavis's testimony regarding the incident in which Darrell grabbed Jack's left arm, are together sufficient evidence to have warranted an instruction on intentional assault and battery. Sufficient circumstantial evidence was also before the jury permitting them to find that the defendants knew, or that an ordinary person in the same circumstances would have known, of the injury to Jack's elbow. See *Commonwealth* v. *Garcia*, 47 Mass. App. Ct. 419, 422 (1999). Accordingly, the evidence also supported an instruction on wanton or reckless assault and battery. See *id.* at 423.

The judge's instructions as to indictments 103620 and 103637 were given directly after she had instructed the jury as to indictments 103619 and 103636.[12] She had accordingly just instructed the jury regarding the definitions of intentional assault and battery and wanton or reckless assault and battery. Since the jury received instruction on the meaning of both intentional and wanton or reckless assault and battery, and were presented with evidence from which a reasonable jury could find such conduct, we are persuaded that, in these circumstances, the omission of an instruction to consider the wanton or reckless theory of assault and battery as to indictments 103620 and 103637 did not

---

[12]Indictments 103619 and 103636 alleged assault and battery causing bodily injury to a child under fourteen years of age, for fractures to five of Jack's fingers.

create a substantial risk of miscarriage of justice. See *Commonwealth* v. *Russell*, 439 Mass. at 351.

*Judgments affirmed.*