COMMONWEALTH *vs.* WILSON PASTEUR.

No. 04-P-850.

Essex. January 6, 2006. - July 24, 2006.

Present: GREENBERG, COWIN, & MILLS, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Challenge to jurors, Argument by prosecutor. *Malice. Intent. Joint Enterprise. Self-Defense. Jury and Jurors. Evidence,* Firearm, Expert opinion, Prior misconduct, Relevancy and materiality.

At the trial of an indictment charging the defendant with murder on a theory of joint venture, there was neither error nor confusion in the judge's instructions to the jury, which accurately described malice, properly distinguished the malice required for murder in the second degree, and correctly informed the jury that the defendant must share the malice required of the principal in order to be found guilty as a joint venturer [816-818]; further, the judge correctly determined that instructions on self-defense and provocation were not required in the circumstances of the case, and his abbreviated instructions on self-defense, given in connection with the issue of shared intent, were an excessive precaution that did not prejudice the defendant [818-821]; finally, the judge correctly declined to instruct on reasonable provocation as a basis for a verdict of voluntary manslaughter, where there was no permissible view of the evidence on which the jury could have returned a manslaughter verdict against the principal on such a basis [821-822].

This court found no basis on which to second-guess a judge's decision at a murder trial permitting the prosecutor's exercise of a peremptory challenge against the only black juror on the panel, where it was clear from the record that the judge independently evaluated the prosecutor's rationale for the challenge and did not provide his own reasons for dismissing the juror. [822-825]

A criminal defendant failed to preserve his objection to the admission in evidence at trial of certain expert testimony [825-826], and the judge's admission in evidence of the expert testimony of a firearms examiner was proper [826-827].

At a criminal trial, certain physical evidence of the defendant's prior criminal activity was properly admitted as relevant to the defendant's state of mind [827-828]; further, the admission of testimony concerning other prior criminal activity, even if error, did not give rise to a substantial risk of a miscarriage of justice, where the prejudicial effect, given the record as a whole, was slight [828].

Statements made by a prosecutor in closing argument, consisting of a permis-

sible inference from the evidence and a rhetorical flourish, did not give rise to prejudicial error. [828-829]

INDICTMENTS found and returned in the Superior Court Department on August 9, 2000.

The cases were tried before *Richard E. Welch III*, J.

*Alan Jay Black* for the defendant.

*Marcia H. Slingerland*, Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant, Wilson Pasteur, appeals primarily from his conviction by a Superior Court jury of murder in the second degree on a theory of joint venture.[1] He challenges the jury instructions on several grounds, including that the judge explained inaccurately both the concept of malice and the mental state required for joint venture liability, and that it was error for the judge to instruct in the manner that he did on self-defense and to refuse to instruct altogether on provocation. The defendant also asserts that there were errors affecting the trial, including the prosecutor's peremptory challenge, allowed by the judge, of the only black juror on the panel; the erroneous admission of certain expert testimony; the erroneous admission of evidence of prior uncharged offenses; and improprieties in the prosecutor's closing argument. We conclude that the judge's instructions, including his treatment of the issue of self-defense and his omission of an instruction on provocation, were correct. We determine also that the judge did not abuse his discretion in allowing a peremptory challenge of the black juror; that his rulings on evidence were, with one possible exception, justified and, with respect to that exception, that there was no prejudice to the defendant; and that there was nothing improper in the prosecutor's closing argument. Accordingly, we affirm the convictions.

1. *Facts.* We describe so much of the factual background as is necessary to put the issues in context, reserving certain details for later discussion. The jury could permissibly find that the defendant, nineteen years old at the time, lived in an apartment

---

[1]The defendant was also convicted of unlawfully carrying a firearm. A charge of unlawful possession of a firearm was the subject of a nolle prosequi.

in Lynn with his mother, brother, and two sisters. The defendant's friend, Eric Miller, had been staying with the defendant's family for several months. The defendant and Miller were part of a gang called "Folk." Miller also associated with Derek Wright, a member of the "Crypt" or "A.K." gang.[2]

On the evening of June 5, 2000, Miller met the defendant at the apartment and informed him that Wright wanted to go on a "mission." Miller explained that Wright wanted to retaliate for injuries that Wright had sustained earlier that week in an attack by the "Bloods," a rival gang. Wright apparently planned to make use of a .357 caliber handgun that he and Miller had stolen a few days before.

Miller and the defendant walked to Wright's house. Wright, who at that time carried the .357 in the waistband of his pants, described his plan of attack to the defendant. The defendant questioned why all three men should go looking for Bloods when there was only one gun. Wright responded by bringing the defendant and Miller to a fellow gang member's house to procure another stolen gun, this one a .44 caliber handgun. The defendant took the .44, claiming that Miller should not have it because he was a "hot head." Wright loaded the gun for the defendant and told him to "just pull the trigger" in order to fire. The defendant and Miller then switched pants so that the defendant could carry the .44 in his waistband.[3]

With the defendant and Wright now armed, the three discussed possible locations where they might find Bloods. After discounting several locations for tactical reasons, they decided to go to Lowell Street, where they knew a group of Bloods "hung out." The three walked down Lowell Street and passed a group of Bloods sitting in a white car. When they got to the end of the street, Wright instructed Miller and the defendant to circle around the block and come back up Lowell Street. Wright said that he would count to thirty-seven and then start walking back toward the white car. Wright would then fire

---

[2]There was conflicting testimony whether Wright was in fact a "Crypt" or an "A.K."

[3]The defendant arrived wearing pants with an elastic waistband, and Miller was wearing jeans; they switched because the defendant's elastic waistband could not support the gun.

at the Bloods from the back of the car while the defendant fired from the front.

The defendant and Miller circled around the block. As they walked, the defendant told Miller that he thought the plan was "stupid" because they or Wright could get shot. Despite this, the two continued to circle the block.[4] They reached Lowell Street, but did not see Wright where he had planned to be, so they continued past the Bloods' car. After they walked past the car this time, several of the Bloods got out of the car and began shouting insults at them. The defendant and Miller began to walk faster, but the Bloods followed them down the street. The defendant and Miller both observed the Bloods carrying items, including bricks and sticks, behind their backs or under their shirts. At this point, they also observed Wright holding a gun and wearing a bandana over his face, squatting in the street in front of a white van.

The defendant passed Wright and the white van, then turned and faced the Bloods. As the defendant and the closest Blood exchanged insults, the defendant took out his gun, held it by his side, then raised and pointed the gun. The closest Blood ran. The defendant fired a shot, and the other Bloods ran as well. The defendant attempted to fire a second shot, but the gun would not work. After the defendant fired, Wright "popped up" and fired four or five shots. One of Wright's shots struck the victim, Savorn Prom, in the face and killed him.

Miller, Wright, and the defendant fled from Lowell Street on foot. The defendant and Miller met back at the defendant's apartment, where the defendant unloaded the .44 and put the bullets in a sock. They then took a taxicab to a friend's house, where the defendant hid the .44. The next day, after hearing that the police were looking for them, the defendant and Miller left for Boston, where they were eventually found hiding in an apartment closet.

The defendant and Wright were both charged with murder; Wright as a principal, and the defendant as a joint venturer. Miller was also charged, but pleaded guilty to manslaughter in exchange for his testimony against the defendant and Wright. In

---

[4]The defendant testified that he continued despite his reservations because he did not think that Wright would actually follow through with the plan.

separate trials, Wright was convicted of murder in the first degree on a theory of deliberate premeditation,[5] while the defendant was convicted of murder in the second degree as a joint venturer. The defendant now appeals.

2. *Instructions on joint venture and malice.* The defendant asserts that he was denied due process because the judge gave erroneous and confusing instructions to the jury regarding the malice required for different degrees of murder and the requirement that a joint venturer share the mental state of the principal. Because, in a case of this nature, the malice of the principal and the shared intent of the joint venturer are interrelated, we address them together. We locate neither error nor confusion in the judge's instructions, which accurately described malice, properly distinguished the malice required for premeditated murder in the first degree from that required for murder in the second degree, and correctly informed the jury that the defendant must share the malice required of the principal in order to be found guilty as a joint venturer.

In order for the defendant to be convicted as a joint venturer on the theory relied on by the Commonwealth in this case, there must be proof that satisfies the jury beyond a reasonable doubt that the defendant was present at the scene of the crime, was available by agreement to assist the principal if necessary, and shared with the principal the mental state required for the crime. See *Commonwealth* v. *Caramanica*, 49 Mass. App. Ct. 376, 381 (2000); *Commonwealth* v. *Tavares*, 61 Mass. App. Ct. 385, 388-389 (2004). Consequently, before attempting to answer whether the principal's mental state was in fact shared by the alleged joint venturer, the analysis must begin with an understanding of the principal's mental state.

For the principal to have committed a murder, he must have acted with malice. Murder in the first degree on a theory of deliberate premeditation may be established only where there is evidence of malice in the form of a specific intent to kill. See *Commonwealth* v. *Simpson*, 434 Mass. 570, 588 (2001); *Commonwealth* v. *Gaboriault*, 439 Mass. 84, 92 (2003). Thus, it must be shown that an individual "not only . . . consciously

---

[5]Wright's conviction has been affirmed on appeal. See *Commonwealth* v. *Wright*, 444 Mass. 576 (2005).

intended to take certain actions, but that he also consciously intended certain consequences," *Commonwealth* v. *Gunter,* 427 Mass. 259, 269 (1998), here, that a death would result. Malice for purposes of murder in the second degree may also be premised on a specific intent to kill (absent the deliberate premeditation necessary for murder in the first degree). It is also present when an individual has a specific intent to cause grievous bodily injury and a death occurs, or when an individual intentionally takes action where in the circumstances a reasonable person would know that there was "a plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Gaboriault, supra. Commonwealth* v. *Souza,* 34 Mass. App. Ct. 436, 440 (1993).

In the present case, the judge correctly explained that, to convict the defendant of murder as a joint venturer, the jury must first determine that Wright, the alleged principal, had committed murder in either the first or second degree. The judge outlined the elements of each type of murder, described the kinds of intent that constituted malice in connection with each offense, and distinguished the malice required for murder in the first degree from the malice required for murder in the second degree. The defendant objects that the judge did not define the concepts in terms of "specific intent" and "general intent." However, the use of those terms is not required, provided that the judge, as he did here, explains adequately the intent that is required to support a given conviction. See *Commonwealth* v. *Gunter,* 427 Mass. at 268-269.

Having instructed on the requirements regarding a finding that the principal had committed a murder, the judge turned to the instructions on joint venture liability. He identified the elements of a joint venture, largely following the jury instructions approved in part in *Commonwealth* v. *Echavarria,* 428 Mass. 593, 598 & n.3 (1998). Besides instructing that conviction required evidence that the defendant was present at the scene of the crime and by agreement was willing and available to assist the principal if necessary, the judge also addressed the subject of shared intent.[6] In describing the requirement that the defendant share the principal's mental state, i.e., malice, see

---

[6]The case as tried by the Commonwealth required proof of these three

*Commonwealth* v. *Gaboriault*, 439 Mass. at 91-92, the judge added, "if the Commonwealth proves that the defendant had that intent, shared that intent with Derek Wright sometime during the joint venture, while the joint venture is continuing, that is sufficient even if [the defendant] later, without communicating it to anyone, later changes his mind and doesn't have the intent any longer if the joint venture is still going on." Again, this is an accurate statement of the law; once a defendant has entered into a joint venture by being present, agreeing to assist if necessary, and sharing the intent of the principal, he cannot effect a withdrawal from that joint venture unless he communicates his withdrawal to his coventurers. See *Commonwealth* v. *Cook*, 419 Mass. 192, 202 (1994).

The defendant contends that his mental state for purposes of the joint venture in this case must be determined at the time he fired his gun. This argument takes too narrow a view of the evidence relevant to the formation of the joint venture. The requisite mental state may be inferred from the conduct of the defendant and the attendant circumstances. The jury need not consider the defendant's intentions solely at the time of the crime itself, but rather may consider "the whole transaction of which the crime was a part." *Commonwealth* v. *Longo*, 402 Mass. 482, 489 (1988), quoting from *Commonwealth* v. *Durkin*, 257 Mass. 426, 428 (1926). Here, the defendant was not charged with a crime resulting from shots that he fired; rather, the defendant was charged for the shooting carried out by Wright and the defendant's agreement to take part in an enterprise in which he knew Wright contemplated that shooting. Thus, evidence of the defendant's agreement to assist Wright up to the time of the shooting is relevant to establish that he shared with Wright the intent necessary to support liability for murder in the second degree. The judge's instructions on the subject were correct in all respects.

3. *Self-defense and provocation.* The defendant next argues that the evidence entitled him to a full self-defense instruction,

elements. See *Commonwealth* v. *Tavares*, 61 Mass. App. Ct. at 388. The Commonwealth did not proceed on an alternative theory that does not require the defendant's presence at the scene, requiring only that he participated in the offense and "sought to make it succeed." *Id.* at 388-389, quoting from *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. 238, 242 (1982).

and that an abbreviated explanation of self-defense principles, which the judge gave in connection with his instructions regarding the shared mental state required for a joint venture, confused the jury and impermissibly shifted the burden of proof to the defendant to show that he acted in self-defense. The defendant contends also that the evidence entitled him to an instruction on voluntary manslaughter on the basis of provocation. There was no error.

We begin by observing that the concepts of self-defense and provocation are largely, if not altogether, inapplicable to a joint venturer independently of the principal. The joint venturer's criminal liability derives, at least in part, from that of the principal. If, in the course of the joint venture, the accomplice is present, able and ready to assist, and shares the principal's intent (in this case, his malice), the accomplice is responsible for what the principal does irrespective of what else the accomplice may do or think at a given moment. Thus, in the present case, the circumstances surrounding the defendant's firing of his own weapon are irrelevant to whether he can claim self-defense or provocation; the conduct for which the defendant is charged is that of the principal, Wright, whose shot killed the victim. Were the jury to find that Wright acted in self-defense or by reason of provocation, that would suffice to eliminate malice on his part. The defendant would in turn benefit because, absent malice on the part of the principal, there could be no intent leading to murder in the first or second degree that the defendant could share.

Applying these principles to this record, the judge correctly determined that instructions on self-defense and provocation were not required. Where deadly force is used, "a self-defense instruction must be given only if the evidence permits at least a reasonable doubt that the defendant reasonably and actually believed that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force." *Commonwealth* v. *Fisher*, 433 Mass. 340, 352 (2001), quoting from *Commonwealth* v. *Hart*, 428 Mass. 614, 615 (1999). The evidence must also raise at least a reasonable doubt that the defendant used all proper means to avoid physi-

cal combat before using deadly force.[7] See *Commonwealth* v. *Berry*, 431 Mass. 326, 335 (2000); *Commonwealth* v. *Fisher*, *supra*. In determining whether a self-defense instruction is warranted, "all reasonable inferences should be resolved in favor of the defendant, and, no matter how incredible his testimony, that testimony must be treated as true." *Commonwealth* v. *Pike*, 428 Mass. 393, 395 (1998).

Here, the evidence did not suggest any theory on which the principal, Wright, was privileged to act in self-defense when the conduct forming the basis of the murder charge occurred, i.e., when Wright shot the victim. The evidence shows that Wright, the defendant, and Miller came to Lowell Street seeking out physical conflict, and that Wright and the defendant were the first to use force of any kind against the rival gang. Self-defense is generally unavailable where the defendant provokes or initiates an attack. See *Commonwealth* v. *Naylor*, 407 Mass. 333, 335 (1990); *Commonwealth* v. *Curtis*, 417 Mass. 619, 632-633 (1994); *Commonwealth* v. *Tirado*, 65 Mass. App. Ct. 571, 577 (2006). In addition, although there was evidence that Wright and the defendant were being approached by Bloods who may have been concealing weapons at the material time, there was no evidence demonstrating that Wright and the defendant could not have retreated before Wright fired. Where a confrontation occurs on a public street and there is no evidence that the principal was not able to walk away, there is no basis for a claim of self-defense. See *Commonwealth* v. *Curtis*, *supra*; *Commonwealth* v. *Berry*, *supra*; *Commonwealth* v. *Alves*, 50 Mass. App. Ct. 796, 809 (2001); *Commonwealth* v. *Toon*, 55 Mass. App. Ct. 642, 653 (2002).

In arguing that he was entitled to a self-defense charge, the defendant focuses on his firing of his own weapon in response to approaching rival gang members. The defendant's privilege, or lack thereof, to fire *his* gun, however, is not at issue; as we have stated above, the conduct for which the defendant was charged was the assistance he rendered in the murder commit-

---

[7]The same prerequisites for self-defense apply whether the defendant is seeking an instruction on justification by self-defense, or an instruction on manslaughter by excessive force in self-defense. See *Commonwealth* v. *Walker*, 443 Mass. 213, 216 (2005).

ted by Wright. Therefore, even if the defendant's conduct in firing his gun could have been justified as self-defense had the defendant acted independently, that justification is irrelevant to him as a joint venturer. We note in any event that, on this record, there is no better basis for a claim of self-defense by the defendant than there is for Wright.

It was an excessive precaution for the judge to give an abbreviated self-defense instruction in connection with the issue of shared intent. The judge had made it clear that the jury were entitled to consider the entire transaction of which the crime was a part, and all attendant circumstances, in drawing inferences regarding the defendant's intent. See *Commonwealth* v. *Longo*, 402 Mass. at 489. Thus, the jury permissibly could consider the defendant's state of mind when he discharged his weapon to whatever extent it might bear on whether he shared the principal's intent. It was unnecessary for the judge to single out the particular point in the instructions. However, there was no objection to this portion of the charge, and even were there error, there was no prejudice to the defendant, much less a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967). If anything, the defendant received more than his due. That the judge did not provide a complete explanation of self-defense, including the allocation of the burden of proof, is of no consequence where the defendant was not entitled to a self-defense instruction and the abbreviated explanation was given for a different purpose.

Likewise, the judge correctly declined to instruct on reasonable provocation as a basis for a verdict of voluntary manslaughter. As in the case of self-defense, we examine whether the principal, Wright, was entitled to such an instruction in order to determine what, if any, intent of the principal the defendant may have shared.

A verdict of manslaughter is permitted where there is evidence that a killing "is the result of 'a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' " *Commonwealth* v. *Keohane*, 444 Mass. 563, 567 (2005), quoting from *Commonwealth* v. *Berry*, 431 Mass. at 334. There must be evidence that "something happened which would have been likely to

produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." *Commonwealth v. Curtis*, 417 Mass. at 629, quoting from *Commonwealth v. Walden*, 380 Mass. 724, 728 (1980). The evidence must support a finding that the defendant did not "cool off," and would not reasonably have "cooled off," between the triggering event and the homicide. See *Commonwealth v. Keohane, supra.* In cases where sudden combat is the claimed provocation, the victim generally must attack the defendant or at least strike a blow against the defendant in order for a manslaughter instruction to be required. See *Commonwealth v. Curtis*, 417 Mass. at 629; *Commonwealth v. Masello*, 428 Mass. 446, 450 (1998); *Commonwealth v. Brum*, 441 Mass. 199, 206 (2004).

In determining whether a provocation instruction was required, we examine the evidence in the light most favorable to the defendant. See *Commonwealth v. Sirois,* 437 Mass. 845, 853 (2002). We conclude that there was no permissible basis on which a jury could have returned a manslaughter verdict against the principal, Wright, on the basis of reasonable provocation. Wright sought to retaliate against the Bloods for an earlier attack, enlisted the defendant and Miller in the enterprise, created a plan, armed himself as well as the defendant, and advanced with his allies to Lowell Street expecting to engage in a fight. In these circumstances, Wright and the defendant could scarcely have been surprised when their targets threatened to resist, and nothing that transpired invoked anything remotely resembling a response by Wright caused by a sudden transport of passion or heat of blood, a reasonable provocation, or sudden combat. Once it is concluded that reasonable provocation is unavailable to Wright as a basis for negating malice, it is unavailable to the defendant as well.[8]

4. *The peremptory challenge.* The defendant asserts that the judge, in allowing a peremptory challenge of the only black juror, failed to abide by the requirements of *Commonwealth v.*

---

[8]We add that, even were the defendant entitled to an examination of his own actions independent of those of Wright, on this record he would still not be entitled to a provocation instruction.

*Soares*, 377 Mass. 461, 489-491, cert. denied, 444 U.S. 881 (1979), which apply whenever a pattern of excluding jurors based on group membership can be shown. Accordingly, he argues that the judge's dismissal of the juror was error that deprived the defendant of his right to an impartial jury under the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.

When the jury had been impaneled but not yet sworn, the prosecutor informed the judge that he had become aware that the information given by one juror on his juror questionnaire was inaccurate. The juror had represented that neither he nor his immediate family had had any involvement "as a party or a victim in a civil or criminal case." However, the prosecutor had learned from the Lynn police, and confirmed from a review of probation records, that the juror had been convicted of breaking and entering in 1979; had been indicted on charges of aggravated rape and kidnapping in 1980; and was presently in default on a minor motor vehicle charge.[9] The prosecutor argued that the misrepresentation invited a dismissal of the juror for cause or, in the alternative, that in light of the new information the Commonwealth should be permitted to exercise a peremptory challenge to remove the juror. The prosecutor added to his argument the proposition that the juror was potentially biased against the police and the prosecutor's office by virtue of having previously been prosecuted for serious felonies by that same office, and that such bias could be significant because police credibility would be an issue at trial.

The judge conducted a voir dire of the juror regarding his omission on the jury questionnaire, and then heard argument from defense counsel whether the juror could be challenged for cause, or whether the omission was a legitimate basis for a peremptory challenge by the prosecutor. During this hearing, the judge restated the prosecutor's argument why a peremptory challenge could properly be exercised, and stated that this was

---

[9]The prosecutor had told the police the names of jurors who were from Lynn. A police officer recognized the juror's name because members of his extended family were suing the Lynn police department following the death of another family member who had been in Lynn police custody. The officer then ran a background check on the juror and discovered his prior criminal charges.

"plainly . . . a legitimate reason." Defense counsel objected, claiming that the judge was making the prosecutor's argument for him. The judge then asked the prosecutor to state his reason for challenging the juror, to which the prosecutor responded with substantially the reason he had given before and that the judge had subsequently repeated.

Ultimately, the judge found that the juror's omission was not intentional and consequently did not provide a basis for a removal of the juror for cause. The judge determined also that, because the juror was the sole black person on the jury, there was prima facie evidence of an improper peremptory challenge. He found further, however, that the prosecutor wished to exclude the juror because of his "criminal past," and that this was an acceptable, group-neutral reason. He therefore concluded that the prosecutor's exercise of the peremptory challenge was valid and excused the juror. The defendant now contends that the judge acted improperly and that his *Soares* findings are not entitled to deference because the judge improperly assumed the role of the prosecutor by providing his own group-neutral reason for exclusion of the juror in question, thus relieving the Commonwealth of its burden to come forward with a legitimate reason of its own in response to the *Soares* challenge.

Under the rule set forth in *Soares*, a party may rebut the presumption that peremptory challenges are proper by showing that there is a pattern of excluding members of a discrete group based on sex, race, color, creed, or national origin, see *Commonwealth* v. *Soares*, 377 Mass. at 488-489, and that it is likely that individuals are being excluded solely on the basis of their membership in that group. See *id.* at 489-490; *Commonwealth* v. *Maldonado*, 439 Mass. 460, 463 (2003). A single peremptory challenge may be sufficient to support a rebuttal of the presumption. See *Commonwealth* v. *Garrey*, 436 Mass. 422, 428 (2002). Once the issue of exclusion based on group affiliation has been raised, the judge should make a finding whether a prima facie showing of an improper use of peremptory challenges has been made. See *Commonwealth* v. *Soares*, 377 Mass. at 490; *Commonwealth* v. *Maldonado*, 439 Mass. at 463.[10] If the judge determines that such a showing has been made, the burden

---

[10]"Factors in the assessment include not only the numbers and percentage

shifts to the party exercising the challenge to provide a group-neutral explanation for striking the challenged jurors. See *Commonwealth* v. *Soares*, 377 Mass. at 491; *Commonwealth* v. *Maldonado*, 439 Mass. at 463.[11] After hearing from the opposing party, the judge decides whether the explanation is " 'bona fide' or a mere 'sham,' 'belatedly contrived to avoid admitting facts of group discrimination.' " *Id.* at 464, quoting from *Commonwealth* v. *Soares*, 377 Mass. at 491. The judge's findings and decision are entitled to deference unless he fails to make an independent evaluation of the proffered reasons for the challenge or suggests his own reasons why a given juror should not be seated. See *Commonwealth* v. *Fryar*, 414 Mass. 732, 740-741 (1993), *S.C.*, 425 Mass. 237, cert. denied, 522 U.S. 1033 (1997); *Commonwealth* v. *Calderon*, 431 Mass. 21, 26-27 (2000); *Commonwealth* v. *Garrey*, 436 Mass. at 430.

In the present case, it is clear from the record that the judge independently evaluated the prosecutor's rationale for the challenge and did not provide his own reasons for dismissing the juror. The judge's statement why the juror might legitimately be challenged was nothing more than a restatement of the position already offered by the prosecutor when he requested initially that the juror be removed. The judge did not substitute his own advocacy; rather, he "engaged both the prosecutor and defense counsel in a full discussion on the issue," *ibid.*, ultimately making an independent finding that was informed by the attorneys' arguments. Because the record demonstrates a thoughtful decision consistent with the requirements of *Soares*, there is no basis on which to second-guess the judge's decision.

5. *Admission of expert testimony.* The defendant next argues that it was error to admit the opinion testimony of a pathologist and a firearms examiner, both called by the Commonwealth. The defendant contends there was an inadequate showing that the methods they employed to arrive at their opinions were

---

of group members excluded, but also common group membership of the defendant and the jurors excluded, and of the victim and the remaining jurors." *Commonwealth* v. *Garrey*, 436 Mass. at 428, quoting from *Commonwealth* v. *Robinson*, 382 Mass. 189, 195 (1981).

[11]The reason provided "must pertain to the individual qualities of the prospective juror and not to that juror's group association." *Commonwealth* v. *Soares*, 377 Mass. at 491.

scientifically reliable. See *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-595 (1993); *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25-26 (1994). The objection to the expert testimony of the pathologist[12] has been waived. To preserve an objection to expert testimony pursuant to *Lanigan*, a defendant must file a pretrial motion and request a hearing on the subject. See *Commonwealth* v. *Sparks*, 433 Mass. 654, 659 (2001). Here, the only pretrial objection asserted by the defendant was based on an alleged failure by the prosecutor to provide written notice of the pathologist's opinion and the grounds therefor.[13] In addition, at a voir dire of the pathologist, the defense limited its questioning to her qualifications and her opinion, and the defendant made no inquiry relevant to the expert's methodology. We observe that, even had a proper objection been made, it is not the purpose of the *Daubert* and *Lanigan* decisions to exclude scientific testimony based on broadly accepted and established methodologies such as forensic pathology and autopsy examinations.

The defendant did preserve his objection to expert testimony by a firearms examiner that a bullet found lodged in a porch on Lowell Street was there as the result of a ricochet. The judge conducted a *Lanigan* analysis, and we conclude that he did not abuse his discretion in admitting the opinion testimony. See *Canavan's Case*, 432 Mass. 304, 312 (2000); *Commonwealth* v. *Patterson*, 445 Mass. 626, 639 (2005). Besides general acceptance in the scientific community, other factors such as the testing of the theory, peer review or publication, and known or potential error rates can be considered. See *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 593-594. A judge may also "look to his own common sense, as well as the depth and quality of the proffered expert's education, training, experience, and appearance in other courts" to determine reliability. *Commonwealth* v. *Goodman*, 54 Mass. App. Ct. 385, 391 (2002).

---

[12]The pathologist essentially testified that the victim could not have taken any footsteps after he had been shot.

[13]The trial judge denied the motion as a motion in limine, concluding that the substance of the expert opinions had been disclosed sufficiently despite the lack of a writing. The judge did, however, allow for a later voir dire of the experts, who had not yet been identified by name or had their curricula vitae provided to the defense.

Here, the Commonwealth offered State police Sergeant John Murphy as an expert in ballistics. Sergeant Murphy testified regarding his methodology, which essentially relied on examination of a bullet's shape and substances, if any, on its surface. That information would suggest with what kinds of materials the bullet had come into contact, and from that, judgments could be made with respect to the bullet's likely path of travel. He testified that the seven other qualified investigators in his unit used the same method, and that he had testified previously in Massachusetts regarding ricochet on the basis of that method. The judge could properly use this testimony as a basis for concluding that the methodology was reliable. Furthermore, the ruling was to a great extent academic because Sergeant Murphy was unable to give an opinion on the bullet's trajectory that was meaningful to the case.

6. *Evidence of prior criminal activity.* The defendant asserts that it was error for the judge to admit evidence that bullets shaped into a pitchfork — a symbol of the "Folk" gang — and a shotgun had been found in the defendant's home. There was testimony by Miller that he and Wright had previously stolen the bullets (prior to their shaping) and the shotgun. These items were not used in the events that are the subject of this case. The bullets were admitted over the defendant's objection. The shotgun was not admitted, but Miller testified that it had been stolen, and that it now belonged jointly to the defendant and himself. There was no objection to Miller's testimony regarding the shotgun.

The defendant argues that any relevance the evidence might have had was outweighed by the prejudicial effect of the showing that the defendant had been involved in other criminal activity. "It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing his bad character, or propensity to commit the crime charged, but such evidence may be admissible if relevant for some other purpose." *Commonwealth* v. *Cokonougher*, 32 Mass. App. Ct. 54, 58 (1992), quoting from *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). To be admissible, the relevance of such evidence for a proper purpose must outweigh the undue prejudice that may

flow from it. *Commonwealth* v. *Cokonougher*, 32 Mass. App. Ct. at 59. Here, the bullets shaped into the "Folk" symbol were properly admitted as relevant to the defendant's state of mind. When considered with Miller's testimony that he and the defendant were "Folk," and that Wright's gang was allied with "Folk," the defendant's possession and shaping of the bullets both confirmed his allegiance to his gang and explained why he might be willing to assist a gang ally in attacking gang rivals. The judge did not abuse his discretion in determining that the probative value of the evidence outweighed the prejudice.

Evidence regarding the stolen shotgun was of questionable use. That the gun was taken from the same house as the guns fired by Wright and the defendant during the commission of the crime seems to us of marginal value in deciding the issues in the case. Be that as it may, it is unnecessary to pause long to decide if the admission of statements regarding the shotgun was error because the prejudicial effect, given the record as a whole, was slight. There was no indication that the defendant had stolen the shotgun himself, or that he had ever used it. It was not mentioned in closing argument. There having been no objection to the evidence at trial, we inquire whether there may have been a substantial risk of a miscarriage of justice as a result of the evidentiary ruling, and conclude without difficulty that there was not.

7. *Prosecutorial error.* Finally, the defendant asserts that the prosecutor committed prejudicial error in his closing by arguing facts not in evidence. He takes issue with the prosecutor's statement wherein he described Wright — who was wearing a bandana over his face at the time of his shooting of the victim — observing the defendant and Miller circle around the block in accordance with their prearranged plan. The prosecutor stated in this regard, "And Derek Wright, I suggest to you, under that mask, you may think, has a smile; because that smile is . . . that his boys . . . his boys are just where they promised him they'd be." At trial, the defendant objected separately to the statement that Wright was smiling and the statement that Wright's "boys [were] just where they promised him they'd

Commonwealth *v.* Pasteur.

be."[14] The judge overruled the objections and declined to give a curative instruction. There was no error.

Prosecutors may argue forcefully for a conviction based on the evidence and inferences that may reasonably be drawn therefrom. See *Commonwealth* v. *Kozec,* 399 Mass. 514, 516 (1987); *Commonwealth* v. *Shea,* 401 Mass. 731, 737 (1998). They are prohibited, however, from suggesting facts in argument that have not been introduced into evidence, and from suggesting inferences that could not reasonably be drawn from the evidence. See *Commonwealth* v. *Coren,* 437 Mass. 723, 730 (2002); *Commonwealth* v. *Beaudry,* 445 Mass. 577, 580 (2005). Here, the prosecutor's statement that Wright's "boys [were] just where they promised him they'd be" was an inference that permissibly could be drawn from the evidence. That evidence showed a plan in place whereby each of the participants was assigned a location in relation to the targets, and the leader presumably experienced some sense of satisfaction that the plan appeared to be working. The accompanying reference to a smile under his mask was a rhetorical flourish which the jury, using their common sense, would identify as such. See *Commonwealth* v. *Deveau,* 34 Mass. App. Ct. 9, 14 (1993).

*Judgments affirmed.*

---

[14]On appeal, the defendant objects also to an alleged prosecutorial statement that Wright and his accomplices "lured" the victim to his death. We find no indication in the record that such a statement was made, and in any event, the suggested inference permissibly could be drawn from the evidence.