NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReportersjc.state.ma.us

11-P-1238                                          Appeals Court


COMMONWEALTH  vs.  MATTHEW TRAYLOR.


No. 11-P-1238.

Suffolk.     October 2, 2012. - July 30, 2014.

Present:  Berry, Green, & Meade, JJ.


Child Abuse.  Assault and Battery.  Reckless endangerment of a
    child.  Constitutional Law, Double jeopardy.  Practice,
    Criminal, Double jeopardy.  Statute, Construction.



    Indictments found and returned in the Superior Court
Department on September 12, 2008.

    The cases were tried before Elizabeth M. Fahey, J.

    A motion to stay execution of sentence was heard in this
court by Fecteau, J.


    David Hirsch for the defendant.
    Kevin J. Curtin, Assistant District Attorney (Elizabeth A.
Dunigan, Assistant District Attorney, with him) for the
Commonwealth.


    BERRY, J.  The defendant was charged under G. L. c. 265,

§ 13J(b), on two indictments for assault and battery upon a

child by having care and custody of said child and committing an

assault and battery, or wantonly or recklessly permitting or

allowing another to commit an assault and battery resulting in

substantial bodily injury to the child,[1] and on five indictments

for assault and battery upon a child by having care and custody

of said child and committing an assault and battery, or wantonly

or recklessly permitting or allowing another to commit an

assault and battery resulting in bodily injury to the child.[2,3]

---

[1] On these two indictments, the defendant was convicted on special verdicts under G. L. c. 265, § 13J(b), fourth par., which states as follows:

"Whoever, having care and custody of a child, wantonly or recklessly permits substantial bodily injury to such child or wantonly or recklessly permits another to commit an assault and battery upon such child, which assault and battery causes substantial bodily injury, shall be punished by imprisonment in the state prison for not more than five years, or by imprisonment in a jail or house of correction for not more than two and one-half years."

As noted, the two indictments also charged under G. L. c. 265, § 13J(b), second par.; the defendant was not convicted of commission under this paragraph, which provides:

"Whoever commits an assault and battery upon a child and by such assault and battery causes substantial bodily injury shall be punished . . . ."

[2] On these five indictments, the defendant was convicted by the jury, on special verdicts, under G. L. c. 265, § 13J(b), third par., which states as follows:

"Whoever, having care and custody of a child, wantonly or recklessly permits bodily injury to such child or wantonly or recklessly permits another to commit an assault and battery upon such child, which assault and battery causes bodily injury, shall be punished by imprisonment for not more than two and one-half years in the house of correction."

At the time the child (the defendant's four month old son), whom we shall call Rory,[4] sustained his injuries, he was living with his eighteen month old sister, his mother, his aunt, and his maternal grandfather.  The child's oldest injuries coincided

---

As noted, on these five indictments, the defendant was also charged under G. L. c. 265, § 13J(b), first par.; he was not convicted of commission under this paragraph, which provides:

"Whoever commits an assault and battery upon a child and by such assault and battery causes bodily injury shall be punished . . . ."

[3] Precise definitions in G. L. c. 265, § 13J(a), differentiate between infliction of "bodily injury" versus "substantial bodily injury":

"(a) For the purposes of this section, the following words shall, unless the context indicates otherwise, have the following meanings: --

"'Bodily injury,' substantial impairment of the physical condition including any burn, fracture of any bone, subdural hematoma, injury to any internal organ, any injury which occurs as the result of repeated harm to any bodily function or organ including human skin or any physical condition which substantially imperils a child's health or welfare.

"'Child,' any person under fourteen years of age.

"'Person having care and custody,' a parent, guardian, employee of a home or institution or any other person with equivalent supervision or care of a child, whether the supervision is temporary or permanent.

"'Substantial bodily injury,' bodily injury which creates a permanent disfigurement, protracted loss or impairment of a function of a body member, limb or organ, or substantial risk of death."

[4] A pseudonym.

closely with the first day of his mother's return to work full time, after which time the defendant was the child's primary caretaker, looking after the child at the child's home, although the defendant did not reside there.

In this consolidated appeal, the defendant argues that five of the seven convictions were duplicative; the evidence was insufficient; and a single justice of this court erred in denying his motion for a stay of execution.[5]  We affirm.

In this case, the particularized injuries to the child as charged in the seven indictments were as follows:

| | |
|---|---|
| Indictment 1 -- substantial bodily injury | Lacerated liver. |
| Indictment 2 -- substantial bodily injury | Lacerated spleen. |
| Indictment 3 -- bodily injury | Fractured humerus. |
| Indictment 4 -- bodily injury | Fractured tibia. |
| Indictment 5 -- bodily injury | Fractured iliac crest. |
| Indictment 6 -- bodily injury | Multiple bilateral rib fractures: |

---

[5] Given the result we reach, we find no merit in the defendant's arguments concerning the ruling of the single justice.

| | |
|---|---|
| | Right thorax: two fractures to the posterior eleventh rib, one fracture to the posterior tenth rib, anterolateral fractures of the third, fourth, fifth, sixth, seventh, eighth, and ninth ribs.<br><br>Left thorax: Posterior fractures to the ninth, tenth, eleventh, and twelfth ribs, and fractures to the sixth, seventh, and eighth ribs. |
| Indictment 7 -- bodily injury | Bruises on the body. |

1. _Double jeopardy_. a. _Introduction_. On appeal, the defendant submits that five of the seven convictions predicated upon the aforementioned particularized bodily injuries to the child were duplicative, in violation of double jeopardy rights protected by the Fifth Amendment to the United States Constitution and Massachusetts law. In essence, in advancing this duplicative conviction challenge (which is raised for the first time on appeal), the defendant argues that only two of the child's injuries were proven to have been inflicted by separate acts or on separate occasions, and, thus, the remaining five convictions and punishments were barred by double jeopardy.[6]

---

[6] Sentences of incarceration were imposed on indictments nos. 1 and 3. On indictment no. 1, for causing substantial

In counter, the Commonwealth submits that the "unit of prosecution" underlying G. L. c. 265, § 13J(b), rests on an elemental predicate of the discrete and particularized bodily injury to a child, and that, in § 13J(b), the Legislature sought to enact the broadest protection for children vulnerably placed in the care of a person who commits an assault and battery upon a child[7] or recklessly or wantonly permits the infliction of particular injuries upon a child.  The Legislature, the Commonwealth submits, has the power to enact and define criminal offenses, by an indictable unit of prosecution, such as set forth in § 13J(b), without treading on double jeopardy.

For the reasons which follow, we conclude as follows: first, that G. L. c. 265, § 13J(b), reflects a clear legislative

---

bodily injury, the defendant was sentenced to two years to two years and one day in State prison.  On indictment no. 3, he was sentenced to a consecutive term of two and one-half years in the house of correction, from and after the incarcerated term for indictment no. 1.  Postrelease probationary terms were imposed on the remaining counts.  On indictment no. 2, for causing substantial bodily injury, a term of four years' probation was imposed from and after the sentence on indictment no. 3.  On indictments nos. 4, 5, 6, and 7, for causing bodily injury, four-year terms of probation were imposed to run consecutive to the four-year probation on indictment no. 2, but concurrent with each other.

[7] As we have noted, see notes 1 and 2, supra, the defendant was convicted under the "reckless or wanton" theories under the statute.  Our discussion of the "unit of prosecution" will nevertheless encompass both active and passive acts or omissions under § 13J(b), as both are central to discerning legislative intent concerning the unit of prosecution and are pertinent to the indictments as returned in this case.

intent that the unit of prosecution may be predicated upon, and indictments may be brought (as specifically categorized in the statute), for discrete and particularized injuries to a child occurring while the child is with a caretaker who commits or recklessly or wantonly permits the infliction of such injuries upon the child being cared for; and, second, that this unit of prosecution does not violate double jeopardy, in light of "the legislative power to define offenses," Commonwealth v. Levia, 385 Mass. 345, 347 (1982), and the legislative intent of § 13J(b) "to authorize imposition of multiple punishments for concurrent violations," Commonwealth v. Crawford, 430 Mass. 683, 686 (2000), with respect to discrete and particularized injury to the child held in a caretaking setting.  Cf. Commonwealth v. Welansky, 316 Mass. 383 (1944).

The issues presented in this appeal involve the third prong of double jeopardy, that is, whether multiple punishments are being imposed.  "The double jeopardy clause of the Fifth Amendment to the United States Constitution protects against three distinct abuses:  a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense" (emphasis added).  Mahoney v. Commonwealth, 415 Mass. 278, 283 (1993).  It is this last multiple punishment issue which is presented in this appeal.

We address first the question whether (as the Commonwealth submits) the Legislature, in enacting G. L. c. 265, § 13J(b), intended to authorize as the indictable unit of prosecution -- for which there may be imposed multiple punishments -- discrete and particularized "bodily injury" and/or discrete and particularized "substantial bodily injury."

We then consider whether -- given a legislative intent to define the offense prosecution unit based on specific particularized bodily injuries to the child -- such a defined offense prosecution unit in G. L. c. 265, § 13J(b), violates double jeopardy, as giving rise to multiple punishments for the same offense.

b.  The unit of prosecution under G. L. c. 265, § 13J(b). We turn to the first step in our double jeopardy analysis directed to what unit of prosecution was intended by the Legislature as the punishable act in G. L. c. 265, § 13J(b). "The inquiry requires us to look to the language and purpose of the statutes, to see whether they speak directly to the issue of the appropriate unit of prosecution, and if they do not, to ascertain that unit . . . ." Commonwealth v. Rabb, 431 Mass. 123, 128 (2000).  See generally Bell v. United States, 349 U.S. 81, 83 (1955).

Here, there are a number of persuasive points which we discuss herein, supporting our conclusion that the intended unit

of prosecution under G. L. c. 265, § 13J(b), is the discrete and particularized bodily injury inflicted upon a child.  At the outset, it is clear that, on its face and by its plain terms, there is no question but that G. L. c. 265, § 13J(b), is of that class of criminal laws wherein the "purpose of the statute" is to prevent violence perpetrated upon children who are ever so vulnerable in a caretaking setting.  The act inserting § 13J into G. L. c. 265 was titled, "An Act Prohibiting Certain Acts Against Children."[8]  See St. 1993, c. 340.  To the end of protecting the very vulnerable child placed in a caretaker's hands, in G. L. c. 265, § 13J(b), the Legislature covered a child with a wide protective blanket in a caretaking setting. We believe that enveloping protection for victim-children, and

---

[8] With respect to the legislative history, Justice Dreben wrote in Commonwealth v. Garcia, 47 Mass. App. Ct. 419, 419-420 (1999), as follows:

"Commonwealth v. Raposo, 413 Mass. 182 (1992), held that a parent who failed to take reasonable steps to prevent sexual attacks on her minor daughter by a third person could not be found guilty of being an accessory before the fact.  More than an omission to act was required.  In a concurrence, Justice Abrams, noting that 'a majority of State Legislatures have enacted criminal child abuse statutes which proscribe acts of omission as well as the affirmative infliction of harm,' id. at 189-190, and noting also that 'compelling arguments can be made for and against criminalizing' acts of omission, stated:  'It is for the Legislature to determine whether expanding that duty by criminalizing acts of omission would better protect the Commonwealth's children.'  Id. at 191-192.  In response, the Legislature enacted G. L. c. 265, § 13J . . . ."

the core prosecution unit of § 13J(b), is codified within the specific and discrete enumerated bodily injuries precisely defined in § 13J(a) for "bodily harm" and "serious bodily harm." These key definitional terms are central to understanding the expanse of protection the statute affords, and the unit of prosecution envisioned by the Legislature.  For ease of reference, we repeat the material definitional terms here: "[b]odily injury" encompasses:  "substantial impairment of the [child's] physical condition including any burn, fracture of any bone, subdural hematoma, injury to any internal organ, any injury which occurs as the result of repeated harm to any bodily function or organ including human skin or any physical condition which substantially imperils a child's health or welfare." G. L. c. 265, § 13J(a).  "Substantial bodily injury" includes "a permanent disfigurement [of the child], protracted loss or impairment of a function of a body member, limb or organ, or substantial risk of death."  Ibid.  (The full definitions are set forth in note 3, supra.)

Given the especial vulnerability of a child held in a caretaking custody, we read G. L. c. 265, § 13J(b), as an informed and quite purposeful enactment by the Legislature defining the unit of prosecution predicated upon the victim-child's injuries -- not the often unknowable inflicting actions or omissions by a caretaker or another.  See, e.g., Commonwealth

v. <u>Roderiques</u>, 462 Mass. 415, 422 (2012) ("The elements of § 13J[<u>b</u>], fourth par., are [i] a child under fourteen; [ii] in care and custody; [iii] a substantial bodily injury; [iv] the defendant wantonly or recklessly permitted this substantial bodily injury, or wantonly or recklessly permitted another to commit an assault and battery on the child causing substantial bodily injury").

The prosecution of cases involving injuries to a child "stands in the not particularly unfamiliar posture of a child left in the custody of an identified adult, who suffers injuries of a type that are inconsistent with the explanation given by the custodian and not attributable in the circumstances to ordinary accidental causes."  <u>Commonwealth</u> v. <u>Roman</u>, 43 Mass. App. Ct. 733, 735 (1997), <u>S</u>.<u>C</u>., 427 Mass. 1006 (1998).[9]

---

[9] The tragic litany of child injury cases described in <u>Commonwealth</u> v. <u>Roman</u>, 43 Mass. App. Ct. at 735, illustrates the circumstance of known child injury, but unknowable acts of infliction by the caretaker:

> "<u>Commonwealth</u> v. <u>Woods</u>, 339 Mass. 7, 8-10 (1959) (jury could infer from severity of blow to child's head that it had been struck by defendant during twenty minutes when he was alone with the child in the bathroom); <u>Commonwealth</u> v. <u>Labbe</u>, 6 Mass. App. Ct. 73, 75-76 (1978) (fifteen month old child left in custody of defendant suffered three liver lacerations inconsistent, according to physician, with having been caused by ordinary falls or collisions); <u>Commonwealth</u> v. <u>Cokonougher</u>, 32 Mass. App. Ct. 54, 55-56, 61 (1992) (child in sole care of defendant overnight found asphyxiated); <u>Commonwealth</u> v. <u>Azar</u>, 32 Mass. App. Ct. 290, 304-308 (1992) (four month old child left in custody of

Measured by the core protections contained in the clear definitional terms of G. L. c. 265, § 13J(a) -- all of which are crafted to surround the child and insulate against any injury to be suffered while in the custody of a caretaker, whether inflicted deliberately or recklessly, the Commonwealth, as prosecutorial entity, may bring indictments under G. L. c. 265, § 13J(b), even if the duration of, the precise manner and means of the infliction of the injuries, and the number of blows struck are unknowable because delivered closed from view (meaning without witness thereto) in a private caretaking setting. "Under c. 265, § 13J, it does not matter who committed the batteries, and each person having the care and custody of the child may be found guilty of the offense of permitting anyone to commit an assault and battery." Commonwealth v. Garcia, 47 Mass. App. Ct. 419, 424 (1999). The Commonwealth is not required to prove precisely how the designated injuries occurred, or how the person charged under § 13J either inflicted or permitted the infliction of the discrete and particularized injury upon the child. See Commonwealth v. Robinson, 74 Mass. App. Ct. 752, 759 (2009). General Laws c. 265, § 13J(b), reaches both active, affirmative acts of commission, as well as

defendant on morning when she suffered multiple fractures of bones and other severe injuries)."

inactive, passive omissions that permit injury, or that allow another to inflict bodily injury upon the child.  See ibid.

Further reflecting the legislative intent to set the unit of prosecution as the discrete and particularized bodily injury suffered by the child is the staircasing of the penalties, with enhanced criminal sentences tied to injuries to particularized body parts.  Specifically, G. L. c. 265, § 13J(b), provides greater, harsher penalties for acts and omissions that lead to substantial bodily injury versus less serious bodily injury. This differential in the statute is categorized and defined by black-letter definitions in § 13J(a) expressly linked to bodily parts (i.e., "[b]odily injury" defines, for example, injuries by a burn, bone fracture, subdural hematoma, damage to internal organs, and to bodily functions; and "[s]ubstantial bodily injury" defines, for example, permanent disfigurement, loss of a function of a body member, limb or organ, or injury posing substantial risk of death).  See note 3, supra (full definitions).

For these reasons, we conclude that the seven indictments in this case under G. L. c. 265, § 13J(b), are based on an appropriate unit of prosecution and are consistent with the legislative intent that the unit of prosecution may be predicated upon, and indictments may be brought for, any discrete and particularized injury to a child held within the

control of a caretaker who commits or recklessly or wantonly permits such discrete and particularized injuries, or permits another to commit an assault and battery resulting in such injuries to the child being cared for.[10]

c. The multiple punishment issue. Given our determination that the unit of prosecution is the discrete and particularized bodily injury to the child, the next level of analysis involves whether double jeopardy is violated because multiple punishments may flow from convictions on multiple indicted units of prosecution -- in other words, multiple convictions on multiple indictments for the child's discrete bodily part injuries, as in this case. We conclude not. "[F]ew, if any, limitations are imposed by [the double jeopardy] clause on the legislative power to define offenses." Commonwealth v. Levia, 385 Mass. at 347.

That a unit of prosecution predicated on discrete and particularized injuries (such as charged in the seven indictments in the present case) does not violate double jeopardy harkens back to the legal principles of Commonwealth v. Welansky, 316 Mass. 383 (1944). In the Welansky case, there were nineteen manslaughter convictions for the same predicate

---

[10] For the reasons stated above, we reject the defendant's argument that G. L. c. 265, § 13J(b), is ambiguous and therefore the rule of lenity should apply. Rather, the statute, as we discuss above, reflects a clear and plain statutory offense structure based on discrete and particularized injuries to a child's body.

wanton and reckless acts and omissions which created the inherently dangerous conditions leading to the inferno of the Boston Cocoanut Grove fire.  In response to the defendant's argument that the indictments should have been quashed, the court wrote as follows.  "The Commonwealth did specify the nature of the mortal injuries suffered by the different victims . . . and the harmful consequences to which acts or omissions of the defendant exposed the several victims and which could have been foreseen by the defendant."  Welansky, 316 Mass. at 394. "For constitutional purposes all that is required is that the indictment, read with the bill of particulars, be sufficient fully, plainly, substantially and formally to give the defendant reasonable knowledge of the crime with which he is charged" (quotations omitted).  Id. at 396.

Indeed, of further legal pertinence to this case, where the defendant was convicted only of wanton or reckless acts or omissions, see notes 1 and 2, supra, is the Welansky definition of "wanton or reckless," which is embedded in G. L. c. 265, § 13J(b).  As Welansky held and as G. L. c. 265, § 13J(b), tracks, "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high

degree of likelihood that substantial harm will result to
another."  Welansky, 316 Mass. at 399.[11]

Where, as here, there were numerous injuries occurring over
a period spanning close to thirty days, it was open to the
Commonwealth to seek multiple indictments, each specifically
identifying the discrete injury suffered.  Compare Commonwealth
v. Vega, 36 Mass. App. Ct. 635, 641 (1994) (no error in imposing
successive sentences for unnatural rape and rape occurring in
course of single criminal episode; "[t]he realities of the
multiple attacks on the victim warranted -- although they did
not require -- multiple indictments and consecutive
sentences").[12]  Cf. Commonwealth v. Dingle, 73 Mass. App. Ct.

---

[11] The controlling holding in Welansky -- indeed the holding
for which the case is most "famous" -- is the common-law
criminal pronouncement that, "[i]f by wanton and reckless
conduct bodily injury is caused to another, the person guilty of
such conduct is guilty of assault . . . [and] if death results
he is guilty of manslaughter."  Welansky, 316 Mass. 401.
However, in the affirmance of the multiple indictments for and
convictions of the multiple deaths, Welansky also supports that
the proper unit of prosecution was predicated upon indictments
returned for each of the victims who died as a result of the
defendant's single course of reckless and wanton conduct.

[12] As to the quoted statement in Commonwealth v. Vega,
supra, compare Commonwealth v. Tavares, 61 Mass. App. Ct. 385
(2004) (upon special verdict slips, each identifying the body
part injured, each defendant was convicted, inter alia, on six
indictments, each charging violation of G. L. c. 265, § 13J[b],
first par.; evidence showed that child was well before being
placed into defendants' care for approximately one month), with
Commonwealth v. Garcia, 47 Mass. App. Ct. at 421-422
(notwithstanding medical evidence showing twenty-six rib
fractures, a skull fracture, fractures of both clavicles, and

274, 277, 282-283 (2008) (no double jeopardy violation in charging defendant on three indictments for possession with intent to distribute child pornography where police found, inter alia, 945 photographs, 177 videotapes, and multiple floppy discs; because possession of a single image constitutes a violation of the statute, "the Commonwealth could have indicted the defendant separately for each image he possessed or distributed").

Also consistent with our conclusion that multiple injuries to a child, such as are predicated in G. L. c. 265, § 13J(b), may be the subject of separate indictments and punishments without violating the multiple punishment bar of double jeopardy is Commonwealth v. Crawford, 430 Mass. 683 (2000). In Crawford, as in this case, the court focused analysis on the third multiple punishment category of double jeopardy protection, and held that "the Legislature intended to authorize imposition of multiple punishments for concurrent violations of the [manslaughter] statute arising out of a single transaction" because the appropriate unit of prosecution for such crimes is the person killed, not the underlying criminal act. Id. at 686-

two fractures of the leg, and expert testimony identifying "at least two and probably three different times during which the injuries occurred," only two indictments were returned against each defendant under G. L. c. 265, § 13J[b], and each defendant was convicted on only one of the indictments).

687.[13]  "There is no merit to the defendant's contention that he may not be punished for two homicides when he fired only one shot.  The 'probable harmful consequences' of a single gunshot, like the fire started by a single match or the car running out of control due to a single reckless miscalculation, are not limited to one death."  Id. at 687, quoting from Commonwealth v. Vanderpool, 367 Mass. 743, 747 (1975).  Accord Commonwealth v. Melton, 436 Mass. 291, 295 (2002) ("a single act can result in multiple convictions if there are multiple victims").  See also Commonwealth v. Levia, 385 Mass. at 350-351 (no error in sentencing defendant on two convictions of armed robbery of two individuals in the course of a single incident; no double jeopardy violation because the statute was directed to the assault element of robbery).

---

[13] Where a statute governing an offense does not focus on a discrete injury to an individual (unlike G. L. c. 265, § 13J[b]) but, rather, the conduct of the offender, the Supreme Judicial Court has found that the correct unit of prosecution does not take into account the number of discrete victims.  See, e.g., Commonwealth v. Constantino, 443 Mass. 521, 524 (2005) (holding that the unit of prosecution under G. L. c. 90, § 24[2][a 1/2][2], for leaving the scene of a motor vehicle accident, was the driver's conduct, not the number of potential victims affected by the conduct).  The Constantino court observed that, in that case, "the fact that [the] statute is listed as a motor vehicle offense under G. L. c. 90, rather than a crime against a person under G. L. c. 265, further supports the view that the act is scene related."  Ibid.

2.  Sufficiency of the evidence.  Applying the standard of
Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979), we are
persuaded that there was sufficient evidence to support the
seven convictions.

The following is a summary of the evidence from the trial
record.  On September 17, 2007, four month old Rory was brought
to Winchester Hospital by his father, the defendant, and the
child's mother, Emelyn Ortolaza.  The parents referred to
swelling in the child's shoulder.

Examination at this first response hospital revealed
seventeen rib fractures at different stages of healing, a
fractured humerus, a fractured tibia, and a fractured iliac
crest (a bone in the pelvis).  There were bruises over the
baby's entire body including on the left buttocks, leg, head,
and right shoulder.  There was a notable bruise on Rory's rib
cage which virtually "looked like a handprint."  The child was
subsequently taken to Children's Hospital by ambulance.  Further
review by the Children's Hospital child abuse protection team
also discovered that the baby had suffered a lacerated spleen
and a lacerated liver.  According to the trial testimony of Dr.
Alice Newton, one of the treating physicians from the child
protection team at Children's Hospital, the multiple injuries
were not consistent with having been caused by any accident.

The medical evidence concerning the time frame of the indictments (commencing on August 21, 2007, and continuing up to the hours just before the September 17 hospitalization) within which the injuries were inflicted upon Rory was proximate to the first day the defendant became the child's primary caretaker as the mother returned to full-time work.  That is, commencing on August 21, 2007, the defendant became Rory's primary full-time caretaker, and stayed with the baby at the mother's house during the daytime work hours, and sometimes at night and during weekends.  Prior to the September 17 hospitalization, at the child's last doctor visits for routine care, on August 7 and August 15, 2007, the medical providers saw nothing amiss.  The particular time frame concerning particular injuries is discussed infra.

a.  The indictments corresponding to the particular injuries inflicted.  In addressing the defendant's challenge to the sufficiency of the evidence, we set forth the discrete and particularized bodily injuries to the child, and the trial evidence relating thereto for each conviction.

(1) The lacerated liver (indictment 001; substantial bodily injury).  When Rory was brought to Children's Hospital, he had "markedly elevated" liver enzymes, which, according to the medical evidence, was an indication of liver damage.  A computerized tomography scan of the baby's liver showed a grade

"4-5" (of 6) laceration of the liver, an injury which represented "very serious and severe damage to the liver." Dr. Newton described the liver injury as reflective of "very violent trauma" consistent with "some type of blow or crushing of the area." This type of injury is not seen "in household falls" or in "clumsy handling of infants." In a baby of the victim's age, this type of liver injury would be like "being hit in the abdomen or . . . either being stepped on or hit or crushed . . . ." There was "a very large area of damage to the liver," and extensive bleeding so pronounced that the baby "could have bled to death at the time of the injury." In Dr. Newton's medical opinion and diagnosis, the child's liver injury had happened recently, probably within a "few days" preceding the September 17, 2007, hospital admission.

(2) The lacerated spleen (indictment 002; substantial bodily injury). The injury to Rory's spleen comprised "an area of contusion or laceration that went from the front to the back of the spleen." This kind of injury is very painful and very dangerous. The injury to the spleen had been inflicted within days of the September 17 hospitalization.

(3) The fractured humerus (indictment 003; bodily injury). According to the medical evidence, the fracture of Rory's humerus bone had occurred relatively recently in relation to the September 17 hospital admission. This dating rested on the fact

that there was not present any "new . . . bone formation" such as would be expected if the injury had existed for seven to ten days.  Further, according to the medical evidence, the baby's humerus bone fracture was caused by a very different kind of traumatic event than that which could have caused the laceration of the child's liver and spleen.  This fracture was in an unusual location, where the upper arm meets the shoulder socket, and this humerus fracture would require "a lot of force."  That degree of force would be caused by an unreasonable "jerking" of the child or "swinging the child by the arm."

(4) The fractured tibia (indictment 004; bodily injury). There was a "spiral" fracture to Rory's lower leg bone, which was an "acute" or new injury.  In order to have been inflicted, the "spiral" fracture to the tibia required "some kind of torsion or torque, almost twisting movement, in order to develop."

(5) The fractured iliac crest (indictment 005; bodily injury).  The injury to the iliac crest, located "by the hip bone," was, in the doctor's opinion, a "very uncommon" injury that would be inflicted by means of "a tremendous amount of violence and force."  The infliction of this substantial bodily injury would be the result of either a "direct blow or some type of movement that would force [the child's] leg kind of up into the pelvis or force it back in a forceful way to create pulling

or attraction or direct trauma to that bone."  Such major pelvic trauma with resulting iliac crest fracture, as the physician testified, would be comparable to fractures suffered in car crashes.

(6) The fractured ribs (indictment 006; bodily injury). Seventeen of Rory's ribs were fractured.  Thirteen rib fractures showed "callus formation," which indicated that the force causing the fracture may have occurred in the range of seven to ten days before the September 17 hospital admission.  Four of the other fractures bore no callus formation, reflecting a more recent infliction, within approximately seven days of September 17.

There was evidence that "different types of trauma can lead to different locations of fractures in the rib."  The four "younger" fractures on the left side of the child's body were inflicted by means of a "different pressure and a different mechanism" from the manner in which the other, older, thirteen fractures were inflicted.  The older rib fractures as well as the tibia fracture were "clearly not at the same time."

(7) Bruises (indictment 007; bodily injury).  There were four separate bruises.  The child's body was marked by separate distinct bruises including finger-shaped bruises on his abdomen, a singular large bruise on his abdomen, and other bruises on his arm and the right side of his forehead.

b.  _Assessing the evidence_.  Given the above evidence, and applying the _Latimore_ standard, we find no merit in the defendant's arguments that the circumstantial evidence was inadequate; that the evidence was so equivocal as to result in "conviction[s] based on conjecture"; or that the Commonwealth failed to prove that any inaction on the part of the defendant "resulted" in the child's injuries, or that the liver and spleen injuries were so severe as to conform to the definition of "substantial bodily injury" in G. L. c. 265, § 13J.  Nor is there any merit in the defendant's argument that the Commonwealth failed to prove that the defendant's failures to act amounted to wanton or reckless conduct.  See _Commonwealth_ v. _Welansky_, 316 Mass. at 399.

The defendant not only challenges the over-all insufficiency of the evidence which we address above but also, in a further variation, contends that there was insufficient evidence that the child's injuries would have been so apparent that a reasonable person would have known that the injuries existed and, thus, the defendant could not be deemed under the statute to have "permitted" the injuries to have happened.  This insufficiency challenge is also unavailing.

In the special verdicts, the jury expressly found that the defendant, under G. L. c. 265, § 13J(_b_), third and fourth pars., having care and custody of the child, wantonly or recklessly

permitted substantial bodily injury (indictment nos. 1 and 2) or bodily injury (indictment nos. 3-7) to the baby or wantonly or recklessly permitted another to inflict those injuries. For all the reasons previously stated, and based on the analysis of the evidence set forth therein, there was more than ample evidence to support those verdicts. To argue, as the defendant does, that an "ordinary normal man" would not have "sensed grave danger" to the child from many of the patently obvious injuries inflicted upon the baby's body and what must have been cries of anguish is simply not a sustainable contention.[14]

---

[14] We further reject the defendant's contention that only two of the injuries occurred on separate occasions. That contention is belied by the great weight of the medical trial evidence. Even were one to put aside the discrete and particularized injuries to the child, and focus on time-dating the violent act or acts as different "occasions" in point of time (as the defendant would have us do), the medical evidence in this case dated the injuries in five of the indictments as bearing indicia of infliction at different points in time. It was only the massive injuries in the lacerations to the liver and spleen (indictment nos. 1 and 2), and the fractures of the tibia and iliac crest (indictments nos. 4 and 5) that were not susceptible to precise time-dating in the medical testimony. As to the spleen and liver lacerations, Dr. Newton testified that it was not possible to determine whether the injury to the spleen might have been inflicted at the same time as the injury to the liver, because, given the extreme trauma that would lead to both the deep lacerations to the liver and spleen, it was "logically" possible that the blow or blows causing the lacerations of the two organs may have been delivered close in time or at the same time. Similarly, it was also not possible, given the physical characteristics of the respective bone structures, to differentiate by time-dating when the tibia fracture and the iliac crest fracture were inflicted and whether these bones were broken and fractured within the same time frame, or indeed could have happened at the same time.

Conclusion.  We bear in mind, as referenced earlier, that this case "stands in the not particularly unfamiliar posture of a child left in the custody of an identified adult, who suffers injuries of a type that are inconsistent with the explanation given by the custodian and not attributable in the circumstances to ordinary accidental causes."  Commonwealth v. Roman, 43 Mass. App. Ct. at 735.  The host of discrete and particularized injuries to the child's body parts -- a phrase that is wholly inadequate to describe the horrific damages to this four month old baby's body and the number of blows that would have been delivered to cause the baby's physical damage and suffering -- provides the quintessential explanation for why the Legislature enacted G. L. c. 265, § 13J(b), to define the unit of prosecution by the discrete and particularized injury to the child committed by or permitted to be committed by the wanton and reckless caretaker.

Judgments affirmed.

Order of single justice affirmed.