NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11788

COMMONWEALTH  vs.  MATTHEW TRAYLOR.


Suffolk.     February 3, 2015. - July 22, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, & Lenk,
JJ.


Child Abuse.  Assault and Battery.  Reckless Endangerment of a
     Child.  Constitutional Law, Double jeopardy.  Practice,
     Criminal, Double jeopardy.



     Indictments found and returned in the Superior Court
Department on September 12, 2008.

     The cases were tried before Elizabeth M. Fahey, J., and a
motion to stay execution of sentence was heard in the Appeals
Court by Francis R. Fecteau, J.

     After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.


     David Hirsch for the defendant.
     Kevin J. Curtin, Assistant District Attorney (Elizabeth A.
Dunigan, Assistant District Attorney with him) for the
Commonwealth.


     LENK, J.  After trial by jury, the defendant was convicted

in the Superior Court of seven indictments charging offenses

under G. L. c. 265, § 13J (b). That statute, in relevant part, imposes criminal penalties on a person who, "having care and custody of a child, wantonly or recklessly permits bodily injury [or substantial bodily injury] to such child or wantonly or recklessly permits another to commit an assault and battery upon such child, which assault and battery causes bodily injury [or substantial bodily injury]." Id. The seven separate indictments did not allege seven different instances on which the defendant wantonly or recklessly permitted bodily injury to a child, or seven different victims who were harmed as a result of the defendant's conduct. Instead, the seven different indictments were each based on a distinct injury or set of injuries to the victim, Rory,[1] the defendant's son, who was then approximately four months old.

The defendant appealed, contending, inter alia, that the indictments were duplicative. Commonwealth v. Traylor, 86 Mass. App. Ct. 84, 86 (2014). The Appeals Court affirmed, id., and we granted the defendant's application for further appellate review. We hold that, to establish multiple violations of G. L. c. 265, § 13J (b), the Commonwealth must prove either that the defendant engaged in separate and discrete instances of criminal

_____

[1] A pseudonym.

conduct, or that multiple victims were harmed as a result of the defendant's criminal conduct.  The Commonwealth may not establish multiple convictions solely by showing multiple injuries to a single child.  Accordingly, we reverse all but one of the defendant's convictions.

1.  <u>Background</u>.  a.  <u>Facts at trial</u>.  Rory was born in May, 2007.  For approximately the first two months of his life, Rory lived with his mother and the defendant at the defendant's parents' house in East Bridgewater.  The mother then moved to a house in Woburn, where she lived with Rory; his grandfather; his aunt; and his approximately seventeen month old sister, Sara, also the defendant's child.[2]  The defendant continued to live with his parents in East Bridgewater, and sometimes stayed at a cousin's house in Boston.  He was engaged to the mother, however, and maintained regular contact with her and the two children.

Rory was taken to routine medical appointments on August 7, 2007, and August 15, 2007.  At neither appointment did medical providers notice bruising or any other sign of injury.  Shortly thereafter, the mother, who had been Rory's primary caregiver, returned to work.  The defendant, who was at the time

---

[2] Another pseudonym.

unemployed, began to care for Rory most of the time on weekdays while the mother was at work. He would arrive in the morning before she left for work, and watch the child until she arrived home again in the evening. Meanwhile, although Rory's grandmother was separated from the grandfather and lived elsewhere, she sometimes came to the house in Woburn to help care for Sara.

On September 13, 2007, the mother, accompanied by Rory and the grandmother, went to an appointment at the North Suburban Women, Infants, and Children (WIC) program in Woburn. Both of the WIC employees who saw Rory testified that he was crying unusually at the appointment. The director of the WIC program indicated that ordinary appointments involve a weight check of the child, and such weight checks typically were performed with the child wearing minimal clothing. Both employees testified, however, that they did not see Rory without his clothes on. Neither employee observed anything amiss with the child's face. One employee testified that, when asked about the child's crying, the mother responded by saying that something in the office must have been bothering him, and that he was fine until they came in.

The mother testified to two accidents involving Rory that occurred after she returned to work. First, she indicated that

the defendant called her at work one afternoon to tell her that, while he was giving Rory and Sara a bath, Rory slipped out of his hands, and the defendant had to grab Rory by the hand. When she returned home that evening, she looked at the baby and did not see any injuries.

Second, on Saturday, September 15, 2007, the mother attended a birthday party for her cousin. She testified that, as she was doing her hair in preparation for the party, Rory, who had been placed in his car seat on the bed, fell off the bed; Sara may have been rocking the car seat when Rory fell out. When the mother rushed to pick him up from the floor, he was crying, and she noticed a red spot on his head. She was able to soothe him, and continued on to the party. At the party, various people saw and held Rory. Aside from a bruise on his head, no one who attended the party saw anything amiss with Rory.

The mother testified that she did not begin to fear that something was wrong with the baby until a day or so later. She noticed that Rory was crying, and that, although he usually had a big appetite, he did not want his bottle. On Monday morning, September 17, 2007, the mother and the defendant took Rory to a local hospital. The receiving nurse observed "a slight red[] spot on the side of the [child's] forehead, like a little rub

mark."  The mother told the nurse that he had fallen off a bed.

An X-ray taken at the hospital revealed numerous fractures.  Some fractures were "acute," meaning that they had occurred within the last seven days.  Other fractures showed "callus," a material that forms as new bone is laid down around the line of the fracture.  Because callus typically does not appear in infants until at least seven days after an injury, a radiologist concluded that the injuries were "of differing ages," with some happening "very close to the time of the [X-ray] film," while others were "more remote."

Based on the results of the X-ray, Rory was transferred that day to a hospital in Boston.  There, a pediatrician, a social worker with the then Department of Social Services (DSS) (now the Department of Children and Families, see St. 2008, c. 176), and police officers all observed numerous bruises on the child.  Rory had two bruises on his face, above his eye, and bruising on the chest and abdomen, including one very large bruise that reached almost around to his back.  One bruise "almost looked like a hand print."

Two DSS social workers spoke with the defendant and the mother for approximately forty-five minutes while they were at the Boston hospital.  During that interview, the defendant indicated that he had noticed a few days earlier that Rory was

not moving his shoulder very much, and had observed swelling to the baby's shoulder earlier that morning, when Rory woke up crying. Based on the nature of the injuries, the social workers decided to take custody of Rory and Sara. Sara was examined later at the local hospital where Rory had first been taken; doctors observed no injuries or signs of abuse.

While they were at the Boston hospital, the mother and the defendant were approached by officers of the Woburn police department. During that encounter, the defendant appeared upset and agitated. Asked for an interview, he responded that "he had told his story fifty times and that it must be written down somewhere," and stated that he wanted to leave.

Later that day, however, the defendant appeared at the Woburn police station and spoke with one of the officers. At that interview, which was recorded and played for the jury, the defendant indicated that he had been watching Rory during the day for the past three or four weeks, since the mother returned to work. He related both his account of the baby's fall in the tub, which he said had happened on Monday or Tuesday of the preceding week, and the mother's account of Rory's fall off the bed that Saturday. He also admitted that he had seen bruises on Rory before, indicating that he had mentioned to the child's pediatrician that Rory seemed to bruise easily. He denied ever

having lost his temper with the child, and insisted that the bruises the officers had observed were not present when he, the mother, and Rory first arrived at the hospital.

A pediatrician who had reviewed Rory's medical records testified as an expert witness for the Commonwealth. The expert detailed various injuries from which Rory suffered, and indicated that none of the injuries could have resulted from an accident or clumsy handling. Rory had ten rib fractures on the right side of his chest, seven of which were sufficiently old that callus had begun to form, and seven rib fractures on the left side of his chest, three of which showed callus. Such injuries, the expert indicated, would have resulted from "violent squeezing or crushing injuries, such as stepping on an infant or sitting on an infant." Rory had a fracture of the tibia, the lower bone in the leg. That injury similarly would have required a "violent twisting of that leg and bending it forcefully up." He had a fracture to the iliac crest, the pelvis bone. That injury was a "very unusual fracture," and would have required a "tremendous amount of violence and force," akin to a motor vehicle accident. Rory had an injury to his humerus near his right shoulder, in which the bone and the cartilage had been separated. That injury would have required "a jerking force, or swinging the child by the arm." He also

had lacerations to his spleen and liver. Those injuries too could not have resulted from "household falls" or "clumsy handling." Finally, the expert testified that the extensive bruising on Rory's body was unusual for an infant of three months, because "[a]n infant who's not rolling, or walking, or running around, does not have occasion to get bruised."

The expert stated that Rory had no weakness in his bones, and no blood problem that would cause him to bruise easily. The expert indicated that Rory could have gotten "maybe two bruises and two broken bones at the most" from the bathtub fall that the defendant and the mother described, but that such a fall could not have caused the lacerations of the spleen and liver. Similarly, the fall from the car seat could have caused the fracture to the tibia, but could not have caused the shoulder injury, and would be unlikely as the cause of the rib injury. The expert stated that a child of approximately Sara's age would not have had the strength or hand size to cause the injuries.

The expert testified that the injuries would have caused Rory distress that would have been obvious to anyone caring for him. The fractures to the ribs, tibia, and iliac crest would have been very painful, and he would have cried and fussed whenever he was held or changed. The laceration to the liver would have been similarly painful, and would have resulted in

"some distension of the[] abdomen" and "irritability and very likely poor feeding and vomiting."

Nonetheless, none of the individuals who lived in the house in Woburn with Rory testified that he displayed any such behavior until the weekend before he was taken to the hospital. The aunt, who was the mother's sister and was twenty-three years old at the time, testified that she saw Rory at the party that Saturday night, and, although she saw a bruise on his forehead, the child was laughing when she interacted with him. The grandfather similarly testified that Rory looked "okay" at the party and was not crying, that he had never seen bruising on Rory, and that he could not believe it when the social workers described the injuries Rory had suffered because the baby "didn't cry like something like that had happened to him." The grandmother testified that she never saw bruises on Rory and never saw anyone hurt him.

Finally, the mother, who testified pursuant to a grant of immunity and whose relationship with the defendant had ended by the time of her testimony, indicated that she had never seen bruises on Rory's stomach before he was taken to the hospital in Boston. She stated that the defendant "was a great father in [her] eyes." She said, "[W]hen I found out this happened to my child, . . . I was just wondering how I could have missed it,

how I had no idea, you know, all these things happened to my child." She asserted that she believed that her child had "a bone disease problem," even though he had not suffered any additional fractures after September, 2007.

b. <u>Proceedings</u>. The defendant was indicted in September, 2008, on seven different charges of violating G. L. c. 265, § 13J. That statute provides, in relevant part:

> "Whoever commits an assault and battery upon a child and by such assault and battery causes substantial bodily injury shall be punished by imprisonment in the state prison for not more than five years or imprisonment in the house of correction for not more than two and one-half years.
>
> ". . .
>
> "Whoever, having care and custody of a child, wantonly or recklessly permits bodily injury to such child or wantonly or recklessly permits another to commit an assault and battery upon such child, which assault and battery causes bodily injury, shall be punished by imprisonment for not more than two and one-half years in the house of correction.
>
> "Whoever, having care and custody of a child, wantonly or recklessly permits substantial body injury to such child or wantonly or recklessly permits another to commit an assault and battery upon such child, which assault and battery causes substantial bodily injury, shall be punished by imprisonment in the state prison for not more than five years, or by imprisonment in a jail or house of correction for not more than two and one-half years."

G. L. c. 265, § 13J (<u>b</u>).

The first and third indictments charged violations of the statute resulting in substantial bodily injury. These

indictments were based on the lacerated liver and the lacerated spleen. The remaining five indictments charged violations of the statute resulting in bodily injury. These were based on the fractured humerus, the fractured tibia, the fracture to the iliac crest, the seventeen fractures of the ribs, and the bruises on much of Rory's body. At no point during the proceedings in the Superior Court did defense counsel object to this method of charging the defendant.

The jury returned verdicts of guilty on all seven indictments. For each indictment, the jury answered special verdict questions in which they chose between three possible theories for each count. The first theory was that the defendant committed an assault and battery, resulting in bodily injury or substantial bodily injury; the second was that the defendant, having care and custody of the child, wantonly or recklessly permitted bodily injury or substantial bodily injury; the third was that the defendant, having care and custody of the child, wantonly or recklessly permitted another to commit an assault and battery upon a child, resulting in bodily injury or substantial bodily injury. For each indictment, the jury found the defendant guilty on the final two theories, and not on the first theory.

As to the first and third indictments, based on the

substantial bodily injury involved in the lacerated liver and the bodily injury involved in the fractured humerus, the judge sentenced the defendant to consecutive terms of imprisonment of from two years to two years and one day for the first indictment, and two and one-half years for the third indictment. As to the remaining indictments, the judge sentenced the defendant to five four-year concurrent terms of probation.

The defendant appealed. He argued, for the first time on appeal, that his multiple convictions based on distinct injuries or sets of injuries violated the double jeopardy clause of the Fifth Amendment to the United States Constitution, and that the evidence was insufficient to support a conviction on any of the charges. The Appeals Court affirmed the convictions. See Commonwealth v. Traylor, 86 Mass. App. Ct. 84, 86 (2014). As to the double jeopardy challenge, the Appeals Court held "that G. L. c. 265, § 13J (b), reflects a clear legislative intent that the unit of prosecution may be predicated upon, and indictments may be brought . . . , for discrete and particularized injuries to a child occurring while the child is with a caretaker who commits or recklessly and wantonly permits the infliction of such injuries upon the child being cared for." Id. at 88. We granted the defendant's petition for further appellate review, limited to the double jeopardy claim.

2.  Discussion.  a.  Standard of review.  "Our case law provides that unpreserved claims of error" are to "be reviewed to determine if a substantial risk of a miscarriage of justice occurred."  Commonwealth v. LaChance, 469 Mass. 854, 857 (2014).  See Commonwealth v. Gouse, 461 Mass. 787, 799 (2012).  Even if the issue was unpreserved, we will reverse a duplicative conviction.  See Commonwealth v. Kelly, 470 Mass. 682, 700 (2015); Commonwealth v. Sanchez, 405 Mass. 369, 382 (1989).  Accordingly, we proceed to the merits of the defendant's double jeopardy claim.

b.  Double jeopardy.  The Fifth Amendment provides that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."  The double jeopardy clause "protects against three distinct abuses:  a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense."  Commonwealth v. Crawford, 430 Mass. 683, 699 (2000), quoting Mahoney v. Commonwealth, 415 Mass. 270, 283 (1993).  This case implicates the third category of protection.

In evaluating claims of double jeopardy violations, we also distinguish between two situations.  Where a claimed double jeopardy violation arises from multiple "prosecutions for different crimes, under different statutes, arising out of the

same criminal episode[,] . . . we are required to determine whether either crime charged is a lesser-included offense of the other."  Commonwealth v. Donovan, 395 Mass. 20, 28 (1985) (citations and quotation omitted).  A different set of issues arises where, as here, "a single statute is involved and the issue is whether two [or more] discrete offenses were proved under that statute rather than a single continuing offense" (quotation and citation omitted).  Id.  Then our inquiry requires statutory interpretation.  We ask "what 'unit of prosecution' was intended by the Legislature as the punishable act."  Commonwealth v. Botev, 79 Mass. App. Ct. 281, 286 (2011), quoting Commonwealth v. Antonmarchi, 70 Mass. App. Ct. 463, 466 (2007).  To determine the appropriate "unit of prosecution," we "look to the language and purpose of the statute[], to see whether [it] speak[s] directly to the issue of the appropriate unit of prosecution."  Id., quoting Commonwealth v. Antonmarchi, supra.

In ascertaining the unit of prosecution, our case law distinguishes between two broad categories of statutes.  On the one hand, certain criminal statutes are "focused upon the prevention of violence or physical injury to others."  Id.  With respect to that category of offenses, we have held that, "[w]henever a single criminal transaction gives rise to crimes

of violence which are committed against several victims, then multiple indictments (and punishments)" for the crime against each victim "are appropriate." Commonwealth v. Donovan, 395 Mass. at 31. See Commonwealth v. Crawford, 430 Mass. at 685-688 (upholding multiple convictions of involuntary manslaughter based on firing single shot that killed both defendant's girl friend and her unborn fetus); Commonwealth v. Levia, 385 Mass. 345, 346, 350-351 (1982) (upholding multiple convictions of masked armed robbery where defendant robbed convenience store at gunpoint and took money from two different employees); Commonwealth v. Welansky, 316 Mass. 383, 401 (1944) (upholding multiple convictions of manslaughter for deaths resulting from fire at night club owned by defendant); Commonwealth v. Meehan, 14 Mass. App. Ct. 1028, 1028-1029 (1982) (upholding multiple convictions based on two deaths resulting from vehicular homicide, because offense "falls within the general category of homicide offenses" and "[t]hose offenses traditionally have permitted punishment for each death caused by a defendant's criminal conduct").

Another broad category of statutes is directed at "punishing the defendant for conduct offensive to society, as distinct from punishing the defendant for the effect of that conduct on particular victims." Commonwealth v. Botev, 79 Mass.

App. Ct. at 287. With respect to that category of offenses, a single instance of unlawful conduct can support only a single conviction, even if it affected several victims. Id. at 289. In Commonwealth v. Constantino, 443 Mass. 521, 524 (2005), for instance, we held that the offense of leaving the scene of an accident resulting in death, see G. L. c. 90, § 24, was conduct-focused. Consequently, even where multiple victims died as a result of a single instance of proscribed conduct, we concluded that the defendant could be convicted only of one offense under the statute. See id. at 524. Other statutes that we have placed in this category are statutes criminalizing possession of child pornography, see Commonwealth v. Rollins, 470 Mass. 66, 73 (2014); statutes criminalizing the possession of proscribed drugs, see Commonwealth v. Rabb, 431 Mass. 123, 129-132 (2000); and statutes criminalizing open and gross lewdness, see Commonwealth v. Botev, supra at 281-282.

Importantly, with respect to either category, to sustain multiple convictions of the same offense, the Commonwealth generally must establish that the convictions are "premised on . . . distinct criminal act[s]." Commonwealth v. Vick, 454 Mass. 418, 435 (2009). The logic underlying decisions holding that multiple indictments and multiple punishments are appropriate where a single criminal transaction harms multiple

victims, for instance, is that the single transaction gives rise to "separate and distinct" crimes of violence as to each victim. Commonwealth v. Levia, supra at 351. By contrast, where "multiple convictions and sentences" are not based on distinct criminal acts, the convictions are permissible only where "the Legislature has explicitly authorized cumulative punishments." Commonwealth v. Vick, supra at 435. That rule accords with the rule of lenity, which demands that we construe criminal statutes "strictly against the Commonwealth," and that any "ambiguity concerning the [statute's] ambit . . . [is] resolved in favor of lenity" (quotation and citation omitted). Commonwealth v. Donovan, supra at 29.

With these principles in mind, we turn to the language of the statute. We agree with the Appeals Court that the statute falls within the general category of offenses directed against the prevention of violence and injury to others. The statute appears under "Crimes Against the Person" within the General Laws, and it specifically references "assault and battery," a classic crime of violence. Compare Commonwealth v. Meehan, 14 Mass. App. Ct. at 1029.

We see no indication in the language of the statute, however, to suggest -- much less "explicitly authorize[]," Commonwealth v. Vick, 454 Mass. at 435 -- cumulative convictions

and punishments for a <u>single</u> criminal act against a <u>single</u> victim, simply because the act results in multiple injuries. Like other criminal laws, the statute is directed at a particular form of conduct.  The first paragraph of the statute addresses an act of commission ("[w]hoever commits an assault and battery upon a child"); the next two paragraphs address acts of omission ("wantonly or recklessly permit[ting] bodily injury [or substantial bodily injury] to [a] child" or "wantonly or recklessly permit[ting] another to commit an assault and battery upon such child").  Nothing in the language of the statute indicates a legislative intent to make the resulting injuries, rather than distinct instances of proscribed conduct or distinct victims, the unit of prosecution.

The Commonwealth contends that, because the proscribed act of "permit[ting]" must cause either a "bodily injury" or a "substantial bodily injury," the Legislature intended that the injury itself constitute the unit of prosecution.  It is not unusual, however, for a particular form of criminal conduct to be defined in part by reference to its results.  The common-law offense of "reckless assault and battery," for instance, "is committed when an individual engages in reckless conduct that results in a touching producing physical injury to another person."  <u>Commonwealth</u> v. <u>Porro</u>, 458 Mass. 526, 529 (2010).  Yet

we are aware of no instances in which a defendant has been charged with multiple indictments for reckless assault and battery simply because the criminal act caused multiple injuries to the victim.  Indeed, when pressed at oral argument, the Commonwealth was unable to identify any other crime for which the unit of prosecution is a distinct injury to the victim, rather than a separate and distinct criminal act.

The Appeals Court determined that the unit of prosecution under G. L. c. 265, § 13J (b), is "codified" in the statute's definitions of "bodily injury" and "substantial bodily injury." Under these definitions, a "bodily injury" is a "substantial impairment of the physical condition including any burn, fracture of any bone, subdural hematoma, injury to any internal organ, any injury which occurs as the result of repeated harm to any bodily function or organ including human skin or any physical condition which substantially imperils a child's health or welfare."  G. L. c. 265, § 13J (a).  A substantial bodily injury is a "bodily injury which creates a permanent disfigurement, protracted loss or impairment of a function of a body member, limb or organ, or substantial risk of death."  Id.

Again, however, it is common for a criminal statute to define such terms specifically, and to condition the severity of the penalty on the degree of injury suffered by the victim.  A

defendant who commits an assault and battery with a dangerous weapon, for instance, is subject to heightened penalties where the offense "causes serious bodily injury." G. L. c. 265, § 15A (c) (i). Similarly, a defendant who strangles or suffocates a victim is subject to heightened penalties where "such strangulation or suffocation causes serious bodily injury." G. L. c. 265, § 15D, inserted by St. 2014, c. 260, § 24. Each of these statutes expressly defines "serious bodily injury," in terms that resemble the definition of "substantial bodily injury" in the statute at issue here. Compare G. L. c. 265, § 13J (a), with G. L. c. 265, § 15A (d) (defining "serious bodily injury" as "bodily injury which results in a permanent disfigurement, loss or impairment of a bodily function, limb or organ, or a substantial risk of death"). See also G. L. c. 265, § 15D (a). Yet, we have never held that multiple convictions under either statute may be based on multiple injuries to a single victim, unless the Commonwealth proves that each injury resulted from a distinct criminal act.

The Appeals Court's determination was based also on its view that G. L. c. 265, § 13J (b), was intended to "prevent violence perpetrated upon children who are ever so vulnerable in the caretaking setting." Commonwealth v. Traylor, 86 Mass. App. Ct. 84, 89 (2014). Plainly, the intent underlying the statute

is to protect children against violence and injury. The enactment of the statute was prompted by a decision of this court holding that a parent could not be convicted as an accessory before the fact for failing to take reasonable steps to prevent sexual attacks on a minor child. Commonwealth v. Raposo, 413 Mass. 182, 188-89 (1992); Commonwealth v. Garcia, 47 Mass. App. Ct. 419, 419-420 (1999). To that end, as noted, the statute criminalizes acts of omission in addition to acts of commission, Commonwealth v. Garcia, supra at 422-423, and a defendant may be convicted under the statute even in the absence of proof regarding precisely how the injuries to the child occurred. See Commonwealth v. Rodriques, 462 Mass. 415, 422-424 (2012). It does not follow, however, that, because the Legislature limited the elements that the Commonwealth must prove to establish a violation under the statute, the Legislature also must have intended to allow the Commonwealth to prove multiple violations without establishing more than a single instance of criminal conduct directed at a single victim. Indeed, because the proof offered to establish a violation of the statute often consists merely of evidence that a child was "left in the custody of an identified adult" and then "suffer[ed] injuries of a type that are inconsistent with the explanation given by the custodian and not attributable in the

circumstances to ordinary accidental causes," the consequences of defining the particular injury as the unit of prosecution would be especially severe. See Commonwealth v. Roman, 43 Mass. App. Ct. 733, 735 (1997), S.C., 427 Mass. 1006 (1998). Because the statute does not expressly so define the unit of prosecution, the rule of lenity demands that we construe the statute strictly in favor of the defendant, by requiring the Commonwealth to establish separate and discrete acts of "permit[ting]," or multiple victims harmed by the proscribed conduct, in order to sustain multiple convictions under the second and third paragraphs of G. L. c. 265, § 13J (b).

Finally, the Appeals Court determined that its interpretation of the appropriate "unit of prosecution" was consistent with the statute's "staircasing of . . . penalties," whereby "harsher penalties" were imposed "for acts and omissions that lead to substantial bodily injury versus less serious bodily injury." Commonwealth v. Traylor, 86 Mass. App. Ct. at 91. Again, however, linking a harsher penalty with a showing that the proscribed conduct resulted in more severe injury is hardly unusual, yet it has not led us previously to conclude that the appropriate "unit of prosecution" for a crime is a distinct injury. Additionally, the interpretation urged by the Commonwealth, and embraced by the Appeals Court, might well

subvert the "staircasing of . . . penalties" articulated in the statute.  Under G. L. c. 265, § 13J (b), the maximum sentence for conduct that results in substantial bodily injury is twice as long as the maximum sentence for conduct that results in bodily injury.  Under the interpretation urged by the Commonwealth, however, multiple minor bodily injuries such as bruises could, even if they were all the result of a single instance of proscribed conduct, result in a sentence many times longer than the sentence for a similar criminal act that results in "substantial bodily injury."

We are sensitive to the need to protect children against violence and injury in the caretaking setting.  As noted earlier, the statute already provides this protection in various ways, by criminalizing acts of omission in addition to acts of commission, by not requiring the Commonwealth to prove precisely how the injuries occurred, and by imposing stricter penalties where a defendant's conduct results in a substantial bodily injury as opposed to a bodily injury.  Because the double jeopardy clause imposes "few, if any, limitations . . . on the legislative power to define offenses," Commonwealth v. Levia, 385 Mass. 345, 347 (1982), moreover, the Legislature could, if it wished, amend the statute expressly to define separate and discrete injuries to a child as the appropriate unit of

prosecution. Absent any textual support to indicate that the Legislature has adopted each discrete injury as the unit of prosecution, however, and in light of the extreme novelty of that theory and the severity of its consequences for defendants, we reject that theory. Instead, we hold that, to sustain multiple convictions under the statute, the Commonwealth must establish either separate and discrete instances in which a defendant engaged in the proscribed conduct, or that multiple victims were harmed as a result of a defendant's conduct.

c. Consequences of the double jeopardy determination. Having determined that the multiple indictments under G. L. c. 265, § 13J (b), violated the defendant's rights under the double jeopardy clause, we must ascertain the consequences of that determination. On appeal, the defendant argues that all but two of his convictions must be reversed. He notes that the Commonwealth's expert testified that the injuries charged occurred on "at least two occasions," and that it consequently would "be speculative to assume that there were more than two occasions" on which the defendant engaged in the proscribed conduct. The Commonwealth, on the other hand, contends that, even if we accept the defendant's double jeopardy argument, five of the seven convictions should stand. The Commonwealth's argument is essentially that the evidence supported a

determination of "five separate instances of abuse." The Commonwealth acknowledges that "there was no evidence that the injury to the liver and the injury to the spleen . . . occurred at different times"; assumes for the sake of argument that the fractured tibia and the fractured iliac crest "could have happened at the same time"; and accepts that "it is conceivable that the 'finger-like' bruises to the abdomen might have occurred at or near the time of the more recent rib fractures on the left side of [Rory's] body." The Commonwealth asserts, however, that the evidence supported the conclusion that other rib fractures and the fractured humerus resulted from distinct acts of abuse, leading to a total of "five separate instances of abuse."

In our view, both parties' arguments miss the mark. As an initial matter, the conduct proscribed by G. L. c. 265, § 13J, as relevant to this case, is the act of "wantonly or recklessly permit[ting] bodily injury to [a] child or wantonly or recklessly permit[ting] another to commit an assault and battery upon a child." To sustain multiple convictions under those provisions for injuries inflicted on a single victim, therefore, the Commonwealth must establish multiple instances on which the defendant engaged in the proscribed act of "permit[ting]." The Commonwealth may not sustain multiple convictions, as its

argument suggests, simply by showing that the injuries were the result of discrete acts of abuse, without showing that each of these acts of abuse was in turn enabled by a discrete act of "permit[ting]."

Furthermore, in discussing which of the potentially duplicative convictions must be vacated, both parties focus on the question whether the evidence presented to the jury was sufficient to support a finding of a certain number of separate and discrete instances of proscribed conduct by the defendant. In instructing the jury on the second and the third theories, however, the judge did not state that the jury had to find separate and distinct instances of proscribed conduct. Instead, the instructions suggested -- consistent with the indictments at issue -- that the jury needed only to find separate injuries in order to return verdicts of guilt on seven indictments. The judge stated:

> "You may find [the defendant] guilty only if you are unanimously agreed that the Commonwealth has proven beyond a reasonable doubt that [the defendant] committed the offense on at least one specific occasion during the time period alleged in the indictment. It is not necessary for the Commonwealth to prove or for you to agree that the offense was also committed on more than one occasion. However, you must unanimous[ly] agree that the Commonwealth has proven that [the defendant] committed the offense on at least one occasion during the time period alleged in the indictment."

We have held that, "[w]here . . . the judge does not

clearly instruct the jury that they must find that the defendant committed separate and distinct criminal acts to convict on" multiple charges, the resulting convictions "must be vacated as duplicative, even in the absence of an objection, if there is any significant possibility that the jury may have based [the] convictions . . . on the same act or series of acts (emphasis added)." Commonwealth v. Kelly, 470 Mass. 682, 700 (2015). In Commonwealth v. Kelly, supra at 698-702, for instance, a defendant was convicted of two counts of assault and battery. Both charges stemmed from a series of events beginning at a house party, during which the defendant allegedly pushed, tackled, punched, and kicked the victim, another partygoer. Id. at 699. Although these distinct acts could have supported multiple convictions of assault and battery, the judge had failed either "to instruct on separate and distinct acts[] or . . . to make clear to the jury which alleged acts corresponded to which charges." Id. Accordingly, even though the defendant had not objected to the jury instructions at trial, we reversed one of the two assault and battery convictions, concluding that there was a significant possibility that the convictions were based on the same criminal act. Id. at 699, 702.

Here, likewise, the jury were not instructed properly that

they had to find multiple acts of "permit[ting]" to sustain multiple convictions; instead, they were told explicitly that they needed only to find a single act of "permit[ting]."  And while the Commonwealth offered evidence to suggest that five of the victim's seven injuries or sets of injuries resulted from distinct acts of abuse, the Commonwealth did not offer evidence to show that each of these acts of abuse was enabled by a discrete act of "permit[ting]" by the defendant.

It cannot be said, therefore, that there is no significant possibility that the defendant's convictions rested on a single, undivided act of proscribed "permit[ting]."  True, the Commonwealth offered some evidence that the injuries occurred on "at least two occasions."  But even that evidence was severely limited, consisting solely of testimony from the hospital's radiologist and the Commonwealth's expert that certain rib fractures showed "callus," while the other fractures did not, and that callus requires at least seven days to emerge.  Defense counsel aggressively challenged that testimony on cross-examination.  Even if the jury did believe that certain rib fractures originated on an earlier date than the other injuries, moreover, that does not mean that the jury also would have found that the defendant was criminally responsible for "permit[ting]" those earlier injuries.  All of the rib fractures -- both old

and new -- were charged together in a single indictment. The jury could have believed that the earlier fractures were the result of a noncriminal accident (the fall in the bathtub that the defendant and the mother described, for instance), while believing that the other rib fractures and the remaining injuries were the result of a criminal act of "permit[ting]." The jury could have disbelieved the expert's testimony that the earlier rib fractures would have resulted in obvious signs of distress, and instead credited the testimony of the multiple witnesses who testified that they did not see any sign that Rory was in distress until a few days before he was taken to the hospital.

Finally, while the defendant asks only that this court reverse five (rather than six) of his seven convictions, this request is predicated on the assumption that potentially duplicative convictions must be reversed unless there was sufficient evidence from which a properly instructed jury could have convicted the defendant of multiple counts. As noted above, however, that is not the proper framework of analysis. Because the limitation on the relief that the defendant requests is premised on a mistaken apprehension of the law, we do not treat it as a waiver. Although waiver ordinarily would preclude this court from considering issues, claims, or grounds for

relief that are not raised by the parties, where, as here, a valid constitutional claim is properly before this court, the doctrine does not compel us to replicate the parties' legal errors in ordering an appropriate remedy.

In Burks v. United States, 437 U.S. 1, 16-17 (1978), the United States Supreme Court held that, where an appellate court determines that the evidence presented at a trial against a defendant was legally insufficient, the only proper remedy is the direction of a judgment of acquittal. The Court further observed: "In our view it makes no difference that a defendant has sought a new trial as one of his remedies, or even as the sole remedy," explaining that "[i]t cannot be meaningfully said that a person 'waives' his right to a judgment of acquittal by moving for a new trial." Id. at 17. The Court concluded: "Since we hold today that the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal." Id. at 18.

Here, similarly, it makes no difference for our analysis that the defendant concedes that there was sufficient evidence from which a properly instructed jury could have found two distinct violations of G. L. c. 265, § 13J. The jury were not properly instructed, and the test in such circumstances is not

whether there was sufficient evidence to support multiple convictions, but whether there is any significant possibility that the multiple convictions were based on the same act. Because we hold that there was a significant possibility that all of the defendant's convictions were based on a jury finding of a single violation of the statute, the only just remedy is for the court to reverse all but one conviction.

3. Conclusion. Because the verdict indicates that the jury found at least one occasion of criminal "permit[ting]" under the statute, and that the act of "permit[ting]" resulted in "substantial bodily injury" as defined by the statute, one conviction of a violation of the statute resulting in substantial bodily injury may stand. There is a significant possibility, however, that the remaining six convictions -- one of a violation resulting in substantial bodily injury, and five of violations resulting in bodily injury -- rest on the same act of "permit[ting]." Accordingly, those convictions must be reversed. The matter is remanded to the Superior Court for entry of orders consistent with this decision, and for resentencing.

So ordered.